# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HEARTLAND ALLIANCE FOR HUMAN NEEDS & HUMAN RIGHTS d/b/a NATIONAL IMMIGRANT JUSTICE CENTER<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY *et al.*<br><br>    Defendants. | No. 1:16-cv-00211-RMC<br><br><br>ORAL ARGUMENT REQUESTED |

**PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, plaintiff moves this Court for partial summary judgment that the portions of each of the draft Secure Communities statistical monitoring report documents identified in Defendant DHS's *Vaughn* indexes attached to the Declaration of James V.M.L. Holzer in Support of Defendants' Motion for Partial Summary Judgment, dated April 18, 2017 and filed in this action on April 28, 2017 (ECF No. 31-2) (hereinafter, "Holzer Decl."), that are (i) tables with data and (ii) "metrics" (e.g., equations) are not exempt from disclosure. Plaintiff further seeks an order directing Defendant DHS to release those portions of these records.

Plaintiff respectfully submits the accompanying memorandum of points and authorities in support of this motion.

Dated:  May 12, 2017         Respectfully submitted,

                             /s/ Seth A. Watkins
                             Seth A. Watkins (D.C. Bar # 467470)
                                 Email:  watkins@adduci.com
                             Giang "James" T. Tonthat (D.C. Bar # 1031035)
                                 Email: ton-that@adduci.com

- 1 -

ADDUCI, MASTRIANI & SCHAUMBERG, LLP
1133 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 467-8647
Facsimile: (202) 466-2006

Of Counsel:
Mark M. Fleming*
    Email:  MFleming@heartlandalliance.org
HEARTLAND ALLIANCE FOR
HUMAN NEEDS & HUMAN RIGHTS
D/B/A NATIONAL IMMIGRANT JUSTICE CENTER
208 S. LaSalle St., Suite 1300
Chicago, IL 60604
Telephone: (312) 660-1628
Facsimile: (312) 660-1505

*moving for admission *pro hac vice*

*Attorneys for Plaintiff*
*Heartland Alliance for Human*
*Needs & Human Rights*
*d/b/a National Immigrant Justice Center*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HEARTLAND ALLIANCE FOR HUMAN NEEDS & HUMAN RIGHTS d/b/a NATIONAL IMMIGRANT JUSTICE CENTER<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY *et al.*<br><br>Defendants. | No. 1:16-cv-00211-RMC |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT DHS'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Heartland Alliance for Human Needs & Human Rights d/b/a National Immigrant Justice Center ("NIJC") respectfully submits this memorandum of points and authorities in opposition to the motion of Defendant U.S. Department of Homeland Security ("DHS") for partial summary judgment and in support of Plaintiff's cross-motion for partial summary judgment.

I.  **INTRODUCTION AND SUMMARY**

Secure Communities was an immigration enforcement program administered by Defendant U.S. Immigration and Customs Enforcement ("ICE")—a component of DHS—from 2008 to 2014 but then replaced by the Priority Enforcement Program ("PEP") in 2015. *See* Plaintiff's Statement of Material Facts Not in Genuine Dispute (hereinafter, "Plaintiff's Stmt.") at ¶ 6; Declaration of Seth A. Watkins in Support of Plaintiff's Motion for Partial Summary Judgment (hereinafter, "Watkins Decl."), Exhibit 4, available at https://www.ice.gov/secure-communities. Nevertheless, on January 25, 2017, President Donald Trump issued an Executive

Order directing that the Secretary of Homeland Security "shall immediately take all appropriate action to terminate the Priority Enforcement Program (PEP) . . . and to reinstitute the immigration program known as 'Secure Communities.'"  *See* Border Security and Immigration Enforcement Improvements, Exec. Order No. 13767 of Jan. 25, 2017, 82 Fed. Reg. 8793 (Jan. 30, 2017).  Under Secure Communities, each time state and local law enforcement arrested and booked a person into custody for a criminal offense, that person's fingerprints are submitted to the Federal Bureau of Investigation ("FBI")—as is standard practice—but then the FBI also transmits the fingerprints to DHS.  *See* Plaintiff's Stmt. ¶¶ 9-10; Watkins Decl., Exhibit 5 at 4.  At that point, ICE compares the fingerprints with those in an immigration fingerprint database.  *See* Plaintiff's Stmt. ¶ 10; Watkins Decl., Exhibit 5 at 4.  From there, ICE determines if the person also is subject to removal (deportation) and a detainer could be issued requesting that the state or local jail facility hold the individual so that an ICE interview can be conducted.  *Id.*

Concerns arose about the implementation of Secure Communities.  In response to those concerns, on June 14, 2011, DHS's Officer for Civil Rights and Civil Liberties and ICE's Executive Associate Director sent a memo to all ICE and CRCL personnel government stating that the government would "address civil rights complaints" including "statistical anomalies ('yellow flags') recognized through standing quarterly reviews of Secure Communities data."  *See* Plaintiff's Stmt. ¶ 11; Watkins Decl., Exhibit 6 at 1-2, Memorandum concerning "Secure Communities Complaints Involving State or Local Law Enforcement Agencies," dated June 14, 2011, as downloaded from https://web.archive.org/web/20111020082819/https://www.ice.gov/doclib/secure-communities/pdf/complaintprotocol.pdf on May 12, 2017.  That same month, a Task Force on Secure Communities was created at the request of the Secretary of Homeland Security and asked how ICE might improve Secure Communities.  *See* Plaintiff's Stmt. ¶ 12;

Watkins Decl., Exhibit 7 at 2, ICE Office of the Director, PROTECTING THE HOMELAND: ICE RESPONSE TO THE TASK FORCE ON SECURE COMMUNITIES FINDINGS AND RECOMMENDATIONS (Apr. 27, 2012) (hereinafter, "ICE Response to the Task Force"), available at http://www.dhs.gov/xlibrary/assets/hsac/ice-response-to-task-force-on-secure-communities.pdf. Specifically, the Task Force was asked how to address concerns that Secure Communities impacted community policing and involved the possibility of racial profiling. *Id.*

The ICE Response to the Task Force disclosed that DHS's Office of Civil Rights and Civil Liberties ("CRCL") would take a lead role in a quarterly process:

> . . . [I]n order to identify jurisdictions that may be making improper arrests that could result in identification of aliens through Secure Communities, ICE and CRCL have retained a leading criminologist/statistician who is examining data for each jurisdiction where Secure Communities is activated, comparing data for aliens identified by the program to relevant arrest-rate data, and identifying any indications of racial profiling . . . Statistical outliers will be subject to an in-depth analysis . . . This analysis will take place four times per year to ensure consistent monitoring, and the assessments will be shared quarterly with the Department of Justice (DOJ). The data review process initiated with data from the third quarter of fiscal year 2011 (April 1-June 30, 2011), and is continuing on a rolling basis, so that outliers identified in one quarter are subject to in-depth analysis as the statistical analysis is conducted on the next quarter's data. CRCL and ICE expect to release further information on the results of the analysis on a periodic basis once investigation of apparent jurisdiction-specific problems is complete.

*Id.* at 9.

By November 2011, DHS provided further details of the statistical monitoring in a pair of documents both entitled SECURE COMMUNITIES: STATISTICAL MONITORING. The monitoring was summarized in the first such document as follows:

> Each quarter, ICE and CRCL, with the assistance of an outside expert statistician, calculate statistics based on fingerprint submissions, alien identifications, and underlying demographic and

> crime data to identify jurisdictions whose arrest patterns appear unusual or anomalous. . . .
>
> The technical details are available [at this hyperlink], but the statistics are fairly straightforward.  *First*, for each county where Secure Communities has been activated, we compare the percentage of all alien arrestee fingerprints that match an immigration database record to the percentage of that county's population that (based on Census Bureau data) was born abroad.  *Second*, we compare the number of arrested aliens with immigration records to the overall crime data for the county (as surveyed by the FBI) multiplied by the percentage of the county's population that was born abroad.  And *third*, we compare the incidence of less-serious criminal arrests among the identified alien group with the same incidence in the overall crime data.  For each of these metrics, a particularly high score *could* result from unusual or skewed police attention to crimes committed by aliens, or it could instead result from a variety of other circumstances.  Using these calculations, CRCL produces a set of approximately two dozen of the highest-ranking jurisdictions for further analysis, each quarter.

*See* Plaintiff's Stmt. ¶ 15; Watkins; Decl., Exhibit 8, SECURE COMMUNITIES: STATISTICAL MONITORING, (hereinafter, "DHS Statistical Monitoring Document 1") U.S. Dep't of Homeland Security (Nov. 16, 2011), available at https://www.ice.gov/doclib/secure-communities/pdf/ statisticalmonitoring.pdf.

In the second such document, DHS identified certain statistical metrics for the monitoring: (1) a "foreign-born arrestee comparison" which sought to identify "the jurisdictions where aliens appear to constitute a significantly greater fraction of the arrested population than they do of the general population"; (2) a "foreign-born crime comparison" which sought to identify "[p]atterns showing aliens are arrested at a higher rate for minor crimes, relative to their proportion within the population and the underlying crime incidence"; and (3) an "identified alien crime severity comparison" which sought to identify where "enforcement among aliens is particularly concentrated on minor crimes—arrests for which are more often (but not always) discretionary, and therefore the areas in which bias might occur." *See* Plaintiff's Stmt. ¶¶ 16-29;

Watkins Decl., Exhibit 9, at 2-6, SECURE COMMUNITIES: STATISTICAL MONITORING, Dep't of Homeland Security (Nov. 16, 2011), available at https://web.archive.org/web/20121007101300/ http://www.ice.gov/doclib/secure-communities/pdf/sc-statistical-monitoring.pdf. Importantly, DHS set forth in details its equations for calculating these metrics, examples, and so-called "limitations" of the metrics. *Id.*

Several years later, on March 14, 2014, NIJC filed a FOIA request with DHS's CRCL and requested, *inter alia*, "all reports produced related to the Secure Communities Statistical Monitoring, including all draft reports and reports produced by contracted statistician(s)." *See* Plaintiff's Stmt. at ¶ 1; Watkins Decl., Exhibit 1 at 1. It took three years for DHS to finally provided *Vaughn* indexes admitting to the existence of eighty-three (83) *drafts* of Secure Communities statistical monitoring report documents, including seventy-seven (77) iterations of *draft* reports and six (6) "comment matrices" concerning the *drafts*. *See* Plaintiff's Stmt. ¶¶ 2, 4; Watkins Decl., Exhibit 2 at 1. For the first time in a publicly available record, DHS acknowledged that no final reports existed related to Secure Communities statistical monitoring.[1] *See* Plaintiff's Stmt. ¶ 3. The drafts appear to have been created over the time frame May 2011 August 2013. *See* Plaintiff's Stmt. ¶ 4; Watkins Decl., Exhibit 2; ECF Nos. 25-1, 29-1, 29-2, 29-3, & 29-4. All of the draft reports were withheld in full under the deliberative process privilege, 5 U.S.C. § 552(b)(5) ("FOIA Exemption 5"). *Id.* Other than the headings of the tables that

---

[1] Similarly, on November 4, 2016, NIJC filed a FOIA request with DHS's CRCL and requested, *inter alia*, "all reports produced related to [Priority Enforcement Program ("PEP")] statistical monitoring, including all draft reports, all reports produced by contracted statistician(s), and all statistical and data monitoring reports." *See* Plaintiff's Stmt. ¶ 5; Watkins Decl., Exhibit 3 at 2. DHS first indicated to NIJC on January 12, 2017, in a *Vaughn* index, that "[n]o reports, in draft or final form, were created relating to PEP statistical monitoring." *See* Plaintiff's Stmt. ¶ 6; Watkins Decl., Exhibit 2 at 1. Again, it was the first time that DHS acknowledged in a publicly available record that no final reports existed related to PEP statistical monitoring.

formed the comment matrices, all other portions of those records also were withheld under FOIA Exemption 5. *See* Plaintiff's Stmt. ¶ 4.

Not satisfied with DHS's withholding of the statistical monitoring reports, NIJC requested that the Court order partial summary judgment briefing with respect to DHS's withholdings of (i) tables with data and (ii) "metrics" (e.g., equations) in the draft report documents. *See* ECF No. 25 (Jan. 31, 2017). The Court subsequently suspended ongoing review and production by Defendants DHS and ICE with respect to other documents responsive to other portions of NIJC's FOIA requests at issue in this action and ordered partial summary judgment briefing on the narrow issue of whether the requested portions of the withheld drafts should be ordered instead to be disclosed.[2] *See* Minute Orders (Feb. 1 & 2, 2017).

In sum, as argued below, DHS has failed to meet its burden under Fed. R. Civ. P. 56 and thus its motion must be denied. Moreover, the tables with data and "metrics" (e.g., equations) in each of the withheld draft Secure Communities statistical monitoring report documents identified in Defendant DHS's *Vaughn* indexes are not exempt from disclosure and must be released. Thus, plaintiff's cross-motion for summary judgment must be granted.

---

[2] In its memorandum in support of its motion for **partial** summary judgment, the government states that "Defendants respectfully request that the Court grant their **partial** motion for summary judgment ***and dismiss Plaintiff's Complaint with prejudice***." *See* DHS's Memorandum of Law in Support of Defendants' Partial Motion for Summary Judgment, ECF No. 31, at 1. Of course, given that (i) NIJC's FOIA requests seek disclosure of additional subject matter, (ii) ICE's and DHS's document productions have been suspended by the Court but are not yet completed, and (iii) other disputes may remain to be resolved for example concerning ICE's and DHS's withholdings of other requested records, this action cannot be dismissed when the Court rules on the parties' cross-motions for partial summary judgment.

**ARGUMENT**

**DHS SHOULD BE DENIED PARTIAL SUMMARY JUDGMENT
WHILE NIJC'S CROSS-MOTION SHOULD BE GRANTED**

**II.     SUMMARY JUDGMENT STANDARD AND FOIA**

Summary judgment shall be granted when it can be shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a FOIA case, the agency bears the burden of justifying nondisclosure, 5 U.S.C. § 552 (a)(4)(B) ("the burden is on the agency to sustain its action"), and the agency is thus required to submit detailed declarations identifying the documents at issue and explaining why they qualify for the claimed exemptions. *See Petroleum Info. Corp. v. Dep't of the Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992); *King v. Dep't of Justice*, 830 F.2d 210, 217 (D.C. Cir. 1987); *Vaughn v. Rosen*, 484 F.2d 820, 826-28 (D.C. Cir. 1973). Declarations that are conclusory and nonspecific cannot justify an agency's decision to withhold the requested records. *See Public Citizen Health Research Group v. FDA*, 185 F.3d 898, 906 (D.C. Cir. 1999); *Voinche v. FBI*, 940 F. Supp. 323, 327 (D.D.C. 1996), *aff'd,* 1997 U.S. App. LEXIS 19089 (D.C. Cir. June 19, 1997).

The FOIA statute is unique in administrative law in that it places the burden of justifying withholding on the defendant agency and mandates *de novo* judicial review rather than the usual deferential standard of review. *See Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989) ("Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'") (quoting 5 U.S.C. § 552(a)(4)(B)); *see also Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989) ("the burden is on the agency to demonstrate, not the requester to

disprove, that the materials sought . . . have not been improperly withheld."). Consistent with the Act's dominant policy of disclosure rather than secrecy, the exemptions to FOIA are to be narrowly construed. *See Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).

"[E]ach agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records promptly available to any person," 5 U.S.C. § 552(a)(3)(A), except if a FOIA exemption applies in which case responsive records or portions thereof may be withheld from disclosure. "Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). "[N]on-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).

With respect to FOIA Exemption 5, an agency may withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). "Given the literal language of Exemption 5, it is not surprising that the courts have construed this exemption to encompass the protections traditionally afforded certain documents pursuant to evidentiary privileges in the civil discovery context." *Taxation with Representation Fund v. IRS*, 646 F.2d 666, 676 (D.C. Cir. 1981). To this end, "[t]he courts have recognized that Exemption 5 protects, as a general rule, materials which would be protected under the attorney-client privilege; the attorney work-product privilege; or the executive 'deliberative process' privilege." *Id.* (internal citations omitted).

"The deliberative process privilege protects agency documents that are both predecisional and deliberative." *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006), citing *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). "We deem a document predecisional if 'it was generated before the adoption of an agency policy' and deliberative if 'it reflects the give-and-take of the consultative process.'" *Judicial Watch*, 449 F.3d at 151, quoting *Coastal States*, 617 F.2d at 866.

"[T]he deliberative process privilege directly protects advice and opinions and does not permit the nondisclosure of underlying facts unless they would indirectly reveal the advice, opinions, and evaluations circulated within the agency as part of its decision-making process." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 254 n. 28 (D.C. Cir. 1977). "If [] documents are exempt only because of the deliberative process privilege, the district court must require the [agency] to describe the factual content of the documents and disclose it or provide an adequate justification for concluding that it is not segregable from the exempt portions of the documents." *Id.* "Many [E]xemption [5] disputes may be able to be decided by application of the simple test that factual material must be disclosed but advisory material, containing opinions and recommendations, may be withheld." *Id.* at 256. "Exemption [5] is intended to protect the deliberative process of government and not just deliberative material." *Id.*, citing *Montrose Chemical Corp. v. Train*, 491 F.2d 63, 68-71 (D.C. Cir. 1974).

**III.   THE TABLES WITH DATA AND "METRICS" IN THE DRAFT STATISTICAL MONITORING REPORT DOCUMENTS ARE FACTUAL MATERIAL THAT CANNOT BE WITHHELD**

The DHS Holzer Declaration states that "[t]he drafts described in [DHS's January 12, 2017 *Vaughn* index] [] include tables" which "utilized data ICE ERO provided to CRCL," and "DHS released th[at] data . . . to Plaintiff on October 8, 2014." *See* DHS Holzer Decl. ¶¶ 21-23. Further, DHS's January 12, 2017 *Vaughn* index states that "[t]he information and data contained

within the tables were distilled from a larger group of information and data (the raw data having been released to Plaintiffs prior to the initiation of litigation)." *See* DHS Holzer Decl., Exhibit A at 45. That *Vaughn* index also identifies four categories of draft tables in the withheld documents: tables showing aliens as a share of removals and returns; tables generated to estimate number of aliens not placed within the correct category based on criminal history at time of removal; tables depicting that portion of Secure Communities enforcement activity dedicated exclusively to misdemeanants; table depicting criminal aliens as a share of removals and returns. *Id.* at 45-6. As for the other four *Vaughn* indexes prepared by DHS concerning the withheld drafts, ***none*** indicate whether any tables of data are provided.

As for metrics (e.g., equations), one of DHS's March 31, 2017 *Vaughn* indexes discloses that the withheld draft reports contain "formulas for calculating an IDENT match rate metric" as well as "formulas for calculating a place-of-birth metric." *See* DHS Holzer Decl., Exhibit B at 6-7. As for the other four *Vaughn* indexes prepared by DHS concerning the withheld drafts, ***none*** indicate whether any metrics are provided.

In 2011, DHS itself published two documents entitled SECURE COMMUNITIES: STATISTICAL MONITORING, the first of which generally explained the metrics to be used and the second of which provided the "technical details" including the actual formulas (i.e., equations/metrics) for calculating "IDENT matches," "alien arrest patterns," and the "severity of offenses among IDENT-identified arrested aliens." *See* Plaintiff's Stmt. ¶¶ 15-29; Watkins Decl., Exhibits 8-9. Also, these documents identified limitations associated with the metrics. *Id.* In addition, one of the documents provided tables with sample Secure Communities statistical monitoring data as well as sample calculations using the three Secure Communities monitoring

metrics of "foreign-born arrestee comparison," "foreign-born crime comparison," and "identified alien crime severity comparison." *See* Plaintiff's Stmt. ¶ 29; Watkins Decl., Exhibit 9.

Numerous courts have held that statistical reports, including those that deploy specifically chosen methodologies, are not covered by FOIA Exemption 5. *See, e.g., Carter v. Dep't of Commerce*, 307 F.3d 1084 (9th Cir. 2002); *Assembly of State of California v. Dep't of Commerce*, 968 F.2d 916 (9th Cir. 1992); *Pacific Molasses Co. v. N. L. R. B. Regional Office # 15*, 577 F.2d 1172 (5th Cir. 1978).

The Ninth Circuit's decisions in *Assembly* and *Carter* are particularly instructive. Both sought disclosure of the Census Bureau's "adjusted" population figures for the 1990 and 2000 Census, which were created using statistical methodologies intended to better capture undercounted, generally minority populations. In both instances, the Secretary of Commerce would decide whether to use the adjusted or unadjusted population figures as the official census figures (from which redistricting and federal funding decisions flow). In both instances, the Ninth Circuit held that the statistically "adjusted" population figures are not exempted by (b)(5). Significantly, the Ninth Circuit observed that "the Bureau has already disclosed the method and procedures used to generate adjust data . . . ." *Carter*, 307 F.3d at 1091; *Assembly*, 968 F.2d at 922-23. The Court emphasized:

> [T]he adjusted data would not reveal anything about the most sensitive decision the Secretary had to make, namely which set of figures (adjusted or unadjusted) should be adopted as the official United States census. That decision involved the Secretary's judgment as to which figures best estimated the actual population of the United States. The bare numbers reveal nothing about the process informing that judgment.

*Carter*, 307 F.3d at 1091 (quoting *Assembly*, 968 F.2d at 922).

Similarly here, in the publicly available SECURE COMMUNITIES: STATISTICAL MONITORING document, DHS provided a detailed description of the precise data and statistical

formulas it intended to compile and provided a model of the proposed final quarterly reports. *See* Plaintiff's Stmt. ¶¶ 16-29; Watkins Decl., Exhibit 9.

To the extent that the withheld draft Secure Communities statistical monitoring report documents identified in DHS's *Vaughn* indexes attached to the Holzer Declaration included (i) tables with data and/or (ii) "metrics" (e.g., equations), those portions of the drafts simply are not exempt from disclosure. DHS failed to demonstrate, by Declaration or *Vaughn* indexes, that these withholdings were proper.

As a separate matter, DHS's Declaration and *Vaughn* indexes are facially deficient for failing to adequately describe the presence of tables with data and/or metrics in the drafts. Because DHS's burden under Fed. R. Civ. P. 56 thus has not been met, DHS's motion for partial summary judgment must be denied.

**IV. DHS DID NOT ADEQUATELY JUSTIFY ITS FAILURE TO PROVIDE SEGREGABLE TABLES WITH DATA AND/OR METRICS**

DHS's withholdings of the draft Secure Communities statistical monitoring report documents *in their entirety* (or, essentially in their entirety with respect to the "comment matrices" comprising a few of the drafts) has not been adequately justified. As is clear from the model tables and equations disclosed in the SECURE COMMUNITIES: STATISTICAL MONITORING document, the tables and metrics are discrete, readily segregable portions of the statistical monitoring reports. "If a record contains information that is exempt from disclosure, any reasonably segregable information must be released after deleting the exempt portions, unless the nonexempt portions are inextricably intertwined with exempt portions." *McKinley v. Federal Deposit Insurance Corp.*, 2010 WL 5209337, *7 (D.D.C. 2010) (*citing Hussain v. U.S. Dep't of Homeland Security*, 674 F. Supp. 2d 260, 272 (D.D.C. 2009)). DHS's motion for summary judgment must be denied at least on the basis that it has failed to provide an adequate

justification for concluding that these portions are not segregable from the exempt portions of the documents.  *See, e.g., Mead Data Cent.,* 566 F.2d at 254 n. 28.

DHS therefore failed to meet its burden to demonstrate that all reasonably segregable information has been disclosed.

## V. CONCLUSION

NIJC respectfully requests that the Court grant its cross-motion for partial summary judgment and deny DHS's motion for partial summary judgment.

Dated:  May 12, 2017                    Respectfully submitted,

/s/ Seth A. Watkins
Seth A. Watkins (D.C. Bar # 467470)
    Email:  watkins@adduci.com
Giang "James" T. Tonthat (D.C. Bar # 1031035)
    Email: ton-that@adduci.com
ADDUCI, MASTRIANI & SCHAUMBERG, LLP
1133 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 467-8647
Facsimile: (202) 466-2006

Of Counsel:
Mark M. Fleming*
    Email:  MFleming@heartlandalliance.org
HEARTLAND ALLIANCE FOR
HUMAN NEEDS & HUMAN RIGHTS
D/B/A NATIONAL IMMIGRANT JUSTICE CENTER
208 S. LaSalle St., Suite 1300
Chicago, IL 60604
Telephone: (312) 660-1628
Facsimile: (312) 660-1505

*moving for admission *pro hac vice*

*Attorneys for Plaintiff
Heartland Alliance for Human
Needs & Human Rights
d/b/a National Immigrant Justice Center*