# EXHIBIT 3

```
TRANSMISSION VERIFICATION REPORT
```

```
                                  TIME  : 11/04/2016 16:03
                                  NAME  : AMS LAW FIRM
                                  FAX   : 2024662006
                                  TEL   : 2024676300
                                  SER.# : BROA4V489998
```

```
   DATE,TIME            11/04  15:52
   FAX NO./NAME         3434011
   DURATION             00:11:30
   PAGE(S)              34
   RESULT               OK
   MODE                 STANDARD
                        ECM
```



**ADDUCI MASTRIANI & SCHAUMBERG LLP**

Seth A. Watkins, Ph.D.
(202) 407-8647 direct
watkins@adduci.com

ATTORNEYS AT LAW
1133 CONNECTICUT AVENUE, N.W.  WASHINGTON, DC 20036
Tel:(202) 467-6300  Fax:(202) 466-2006  Web:www.adduci.com

V JAMES ADDUCI II
LOUIS S MASTRIANI
TOM M SCHAUMBERG
DEANNA TANNER OKUN
WILL E LEONARD
MUNFORD PAGE HALL II
MICHAEL L DOANE
SARAH E HAMBLIN
WILLIAM C SJOBERG
JONATHAN J ENGLER
DAVID H HOLLANDER JR
PAUL M BARTKOWSKI
SETH A WATKINS PhD
DANIEL F SMITH
ASHA ALLAM
BEAU JACKSON
THOMAS R BURNS JR
ROWAN M DOUGHERTY
EVAN H LANGDON
LAUREN E PETERSON
JAMES TON-THAT
MICHAEL R DOMAN JR*

OF COUNSEL

November 4, 2016
By Email (foia@hq.dhs.gov) /FAX 202-343-4011

The Privacy Office / FOIA
Office for Civil Rights and Civil Liberties
U.S. Department of Homeland Security
245 Murray Lane SW, STOP-0655
Washington, DC 20528-0655

Re:   **FOIA Request**

To whom it may concern:

This Freedom of Information Act ("FOIA") request is made on behalf of our client the National Immigrant Justice Center, a program of the Heartland Alliance for Human Needs & Human Rights, 208 S. LaSalle St., Suite 1300, Chicago, IL 60604 ("Requester"). <u>All communications concerning this request should be sent to the undersigned attorney, Seth A. Watkins, Adduci, Mastriani & Schaumberg LLP, 1133 Connecticut Avenue, NW, Washington, DC 20036, tel. 202-407-8647, fax 202-466-2006, and email watkins@adduci.com.</u>

Pursuant to the Freedom of Information Act, 5 U.S.C. § 552 *et seq.*, the following Records[1] in the possession, custody, or control of DHS's CRCL are hereby requested (collectively, the "Requests") concerning the Secure Communities Program[2] and the Priority Enforcement Program ("PEP")[3]:



**ADDUCI MASTRIANI & SCHAUMBERG LLP**

Seth A. Watkins, Ph.D.
(202) 407-8647 direct
watkins@adduci.com

ATTORNEYS AT LAW
1133 CONNECTICUT AVENUE, N.W.   WASHINGTON, DC 20036
Tel:(202) 467-6300   Fax:(202) 466-2006   Web:www.adduci.com

V JAMES ADDUCI II

LOUIS S MASTRIANI

TOM M SCHAUMBERG

DEANNA TANNER OKUN

WILL E LEONARD

MUNFORD PAGE HALL II

MICHAEL L DOANE

SARAH E HAMBLIN

WILLIAM C SJOBERG

JONATHAN J ENGLER

DAVID H HOLLANDER JR

PAUL M BARTKOWSKI

SETH A WATKINS PhD

DANIEL F SMITH

ASHA ALLAM

BEAU JACKSON

THOMAS R BURNS JR

ROWAN M DOUGHERTY

EVAN H LANGDON

LAUREN E PETERSON

JAMES TON-THAT

MICHAEL R DOMAN JR*


OF COUNSEL

JOHN C STEINBERGER

*admitted to a bar other
then DC; practice limited
to federal courts & agencies


HARVEY B FOX (1941-2010)


AFFILIATE

AM&S TRADE SERVICES LLC

CARLOS MOORE, PRESIDENT

November 4, 2016
By Email (foia@hq.dhs.gov) /FAX 202-343-4011

The Privacy Office / FOIA
Office for Civil Rights and Civil Liberties
U.S. Department of Homeland Security
245 Murray Lane SW, STOP-0655
Washington, DC 20528-0655

   Re: **FOIA Request**

To whom it may concern:

  This Freedom of Information Act ("FOIA") request is made on behalf of our client the National Immigrant Justice Center, a program of the Heartland Alliance for Human Needs & Human Rights, 208 S. LaSalle St., Suite 1300, Chicago, IL 60604 ("Requester"). <u>All communications concerning this request should be sent to the undersigned attorney, Seth A. Watkins, Adduci, Mastriani & Schaumberg LLP, 1133 Connecticut Avenue, NW, Washington, DC 20036, tel. 202-407-8647, fax 202-466-2006, and email watkins@adduci.com.</u>

  Pursuant to the Freedom of Information Act, 5 U.S.C. § 552 *et seq.*, the following Records[1] in the possession, custody, or control of DHS's CRCL are hereby requested (collectively, the "Requests") concerning the Secure Communities Program[2] and the Priority Enforcement Program ("PEP")[3]:

---

  [1] As used herein, the term "Records" *includes but is not limited to* data (including Excel spreadsheets), transmittals, letters, emails, memoranda, reports (including, e.g., statistical monitoring reports and audit reports), instructions (such as to or from agency staff, contractors, or other providers), and summaries.

  [2] To facilitate an adequate search for relevant Records, attached hereto as Exhibits A-D are documents from the Department of Homeland Security ("DHS") and DHS's Office for Civil Rights and Civil Liberties ("CRCL") describing Secure Communities statistical monitoring.

  [3] To facilitate an adequate search for relevant Records, attached hereto as Exhibits E-F are documents from DHS and CRCL describing the Priority Enforcement Program ("PEP").

The Privacy Office / FOIA
U.S. Department of Homeland Security
November 4, 2016
Page 2

## Records Related to the Secure Communities Program[4]

(1)     all reports produced *between May 6, 2014 and the present* related to Secure Communities statistical monitoring, including all draft reports and reports produced by contracted statistician(s);

(2)     all communications *between May 6, 2014 and the present*, including but not limited to emails, involving ICE and/or contracted statistician(s) regarding Secure Communities statistical monitoring;

(3)     all Records *between May 6, 2014 and the present* related to investigations on jurisdictions where statistical monitoring reports revealed "yellow flag" anomalies or were otherwise chosen for further investigation;

(4)     all Records *between May 6, 2014 and the present* related to asserting DHS Title VI jurisdiction in relation to investigation(s) described in Request No. 3;

(5)     all communications with the DOJ Civil Rights Division *between May 6, 2014 and the present* regarding investigation(s) described in Request No. 3;

(6)     all findings produced *between May 6, 2014 and the present* as part of investigation(s) described in Request No. 3, including drafts of findings;

(7)     all recommendations to ICE or subject jurisdiction(s) of investigation(s) described in Request No. 3 *between May 6, 2014 and the present*, including drafts of recommendations;

(8)     all revisions to the quarterly statistical review protocol for Secure Communities statistical monitoring *between May 6, 2014 and the present*; and

(9)     all communications with DOJ *between May 6, 2014 and the present* regarding the results of investigation(s) described in Request No. 3.

## Records Related to the Priority Enforcement Program ("PEP")

(10)   all reports produced related to PEP statistical monitoring, including all draft reports, all reports produced by contracted statistician(s), and all statistical and data monitoring reports;

---

[4] These specific requests concerning Secure Communities are currently the subject of litigation in *Heartland Alliance for Human Needs & Human Rights d/b/a National Immigrant Justice Center v. United States Department of Homeland Security*, No. 1:16-cv-00211-RMC (D.D.C.).  However, for the FOIA request to DHS/CRCL currently at issue in that litigation, "DHS search taskings were issued on or about May 5, 2014."  *Id.*, ECF No. 17 at 2.  ***Thus, these new requests seek Records subsequent to that date, i.e., between May 6, 2014 and present.***

The Privacy Office / FOIA
U.S. Department of Homeland Security
November 4, 2016
Page 3

(11)   all reports produced related to PEP with respect to the detection of inappropriate use of biometric data to support or engage in biased policing or improper police practices;

(12)   all communications, including but not limited to emails, involving ICE, DHS's CRCL, and/or contracted statistician(s) regarding PEP statistical monitoring and/or reports related thereto;

(13)   all Records related to investigations on jurisdictions where statistical monitoring reports revealed "yellow flag" anomalies or were otherwise chosen for further investigation;

(14)   all Records related to investigations into jurisdictions for which PEP statistical monitoring may have detected "inappropriate use [of PEP] to support or engage in biased policing" or "patterns or trends [related to PEP] consistent with improper police practices";[5]

(15)   all Records related to remedial measures to stop "inappropriate use [of PEP] to support or engage in biased policing" or "patterns or trends [related to PEP] consistent with improper police practices";[6]

(16)   all revisions to the quarterly statistical review protocol for PEP statistical monitoring; and

(17)   all communications with DOJ regarding the results of investigation(s) described in Request No. 13.

The above Requests do **NOT** include any portions of Records specifically identifying a particular individual, that would be covered under the Privacy Act or other privacy protections.

**Prioritization of Document Productions.**  Requester hereby prioritizes the following Records for production by DHS/CRCL without waiving or otherwise limiting the scope of the FOIA requests set forth above:

>   *HIGHEST PRIORITY* -- all final (i.e., non-draft) reports produced related to Secure Communities and/or PEP statistical monitoring;[7]

---

[5] *See* Exhibit E at 3; Exhibit F at 2.

[6] *Id.*

[7] It is Requester's understanding that on a quarterly basis, a criminologist/statistician prepared an assessment with respect to statistical monitoring for indications of racial profiling and that the reports started with quarterly data *circa* June 2011.

The Privacy Office / FOIA
U.S. Department of Homeland Security
November 4, 2016
Page 4

**SECOND HIGHEST PRIORITY** -- all communications, including emails, between or amongst DHS's CRCL, ICE and/or contracted statistician(s) regarding Secure Communities and/or PEP statistical monitoring; and

**THIRD HIGHEST PRIORITY** -- all records related to investigations into jurisdictions that the Secure Communities and/or PEP statistical monitoring reports identified as having "yellow flag" anomalies.

**Possession of Records.**  If DHS/CRCL does not have custody or control over certain requested and responsive Records but knows or believes that another department, agency, private entity, or another subject to FOIA does, such as another operational or support component of DHS, please forward this FOIA request to the appropriate person and inform the undersigned that you have done so.

**Withheld Records.**  If DHS/CRCL believes any Records or portions of the Records are exempt from disclosure, please provide the non-exempt and/or reasonably segregable portions of the Records.  Please also provide a *Vaughn* index identifying all Records or portions thereof that are being withheld from disclosure and state the specific basis for any denial or redaction.

**Request for Expedited Processing and Fee Waiver.**  Requester hereby requests expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E) and a fee waiver under FOIA to the fullest extent permitted by law.

Requester is a nonprofit entity under Section 501(c)(3) of the Internal Revenue code. Dedicated to ensuring human rights protections and access to justice for all immigrants, refugees, and asylum seekers, Requester provides direct legal services to and advocates for these populations through policy reform, impact litigation, and public education.  Through its work, Requester advocates for individual clients as well as for broad-based systemic change.

The primary purpose of the Requester is to inform the legal community and the public about the operation of ICE's Secure Communities program and PEP, and in particular concerns about biased policing in connection with these programs.  This is an issue of significant public interest and concern, and there is a compelling need for disclosure of Records related thereto. Expedited processing therefore is appropriate.

Congress intends that fee waivers be liberally granted for non-commercial requesters. *See Judicial Watch Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers of noncommercial requesters.'").

The Requester is entitled to a fee waiver because the information being sought "is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the [Requester's] commercial interest."  5 U.S.C. § 552(a)(4)(A)(iii); 6 C.F.R. § 5.11(k).  The Requester has a proven track record of compiling and disseminating information to the public about government functions and activities, and intends to make DHS/CRCL's response—and an analysis thereof—publicly available on its website, www.immigrantjustice.org.  Requester has undertaken its work

The Privacy Office / FOIA
U.S. Department of Homeland Security
November 4, 2016
Page 5

concerning biased policing in the public interest and not for any private commercial interest. This FOIA request seeks to obtain information to further the public's understanding of the operation of the Secure Communities program and PEP. Access to this information is a required for the public to meaningfully evaluate the effectiveness of these programs vis-à-vis any collateral consequences. The public has an interest in knowing the operation of these central programs to ICE's interior enforcement strategy. The Records sought in this request will shed light on one of the central public concerns with these programs, in particular alleged racial-profiling.

The Requester is also entitled to a fee waiver as "a representative of the news media." 5 U.S.C. § 552(a)(4)(A)(ii)(II); 6 C.F.R. § 5.11(d)(1). Under the FOIA statute, "a representative of the news media" means "any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii). "News" means "information that is about current events or that would be of current interest to the public." *Id.* Examples of news media entities includes "alternative media" that disseminate their publications for free "through telecommunications services," i.e., the internet. *Id.* Requester has a track record of turning raw material into reports and other publications for distribution to the general public, including over the internet, and does so at no charge. Therefore, DHS/CRCL should not charge Requester any search-related costs for this FOIA request.

The documents subject to this FOIA request are not sought for any commercial use. Thus, in the alternative, Requester understands that no fee may be charged for the first two hours of search time or for the first 100 pages of duplication. 5 U.S.C. § 552(a)(4)(A)(iv)(II); 6 C.F.R. § 5.11(d)(3).

To the extent that fees associated with the Requests exceed the maximum allowable fee waiver, Requester (through its attorneys) hereby agrees to pay fees not to exceed $250.00 in connection with the FOIA requests herein. If DHS/CRCL requires the payment of fees in excess of $250.00, please contact the undersigned to seek advance authorization to proceed and please provide an estimate of fees broken down according to each numbered request above.

**<u>Records Produced in Electronic Form.</u>** To the extent possible, please disclose all Records in connection with this FOIA request in electronic form. Where data is to be disclosed, to the extent possible, please produce native files (*e.g.*, Excel spreadsheets). Please send these Records by email to watkins@adduci.com or on media such as a CD or DVD. If the file sizes of the Records are too large to be emailed or provided on electronic media, please contact the undersigned to arrange another method for transmitting them.

Please produce with the Records any metadata and load files, so that the Records can be accessed, searched, and displayed in a manner comparable to a DHS/CRCL user. If codes are employed (including any numerical list of agencies, jails, or police departments), please also produce any documents in DHS/CRCL's possession, custody, or control explaining the codes employed as well as what they signify.

The Privacy Office / FOIA
U.S. Department of Homeland Security
November 4, 2016
Page 6


    Please respond within 20 business days in accordance with 5 U.S.C. § 552(a)(6)(A).  If
you have any questions regarding this request, please contact the undersigned by email at
watkins@adduci.com or by telephone at 202-407-8647.


                        Sincerely,
                        /s/
                        Seth A. Watkins, Ph.D.

# EXHIBIT A


# Homeland Security

## Secure Communities: Statistical Monitoring
(last revised Nov. 16, 2011)

Through the Secure Communities program, after fingerprints for individuals booked into jails by state and local police are received by the FBI for checks against various criminal justice databases, those fingerprints are then checked against Department of Homeland Security (DHS) databases, revealing if a fingerprinted arrestee may be a removable alien.  The data and information available to DHS can offer a window into policing practices that may help identify potential civil rights issues in state or local law enforcement agencies where Secure Communities is activated.

DHS is committed to ensuring the Secure Communities program incorporates robust civil rights oversight.  To that end, the DHS Office for Civil Rights and Civil Liberties (CRCL) and U.S. Immigration and Customs Enforcement (ICE) have developed a three-part process for identifying jurisdictions in which further analysis and oversight measures may be warranted:

### 1. Statistical monitoring

Each quarter, ICE and CRCL, with the assistance of an outside expert statistician, calculate statistics based on fingerprint submissions, alien identifications, and underlying demographic and crime data to identify jurisdictions whose arrest patterns appear unusual or anomalous. A statistical anomaly does *not* conclusively determine that the jurisdiction is making inappropriate or unlawful arrests.  Rather, the statistics aim to identify a set of jurisdictions for additional analysis.

The technical details are available here, but the statistics are fairly straightforward.  *First*, for each county where Secure Communities has been activated, we compare the percentage of all alien arrestee fingerprints that match an immigration database record to the percentage of that county's population that (based on Census Bureau data) was born abroad. *Second*, we compare the number of arrested aliens with immigration records to the overall crime data for the county (as surveyed by the FBI) multiplied by the percentage of the county's population that was born abroad.  And *third*, we compare the incidence of less-serious criminal arrests among the identified alien group with the same incidence in the overall crime data. For each of these metrics, a particularly high score *could* result from unusual or skewed police attention to crimes committed by aliens, or it could instead result from a variety of other circumstances.  Using these calculations, CRCL produces a set of approximately two dozen of the highest-ranking jurisdictions for further analysis, each quarter.

### 2. Statistical analysis

Having identified jurisdictions to examine, we can then use more resource-intensive and individualized analytic techniques. In particular, we can review data such as: variation in arrest statistics over time; additional demographic information; more detailed general arrest and crime information; seasonal variation in crime patterns; comparison to adjacent jurisdictions; changes in state law, law enforcement policy, or data systems that could produce unusual statistics; and other data that may have been reported.  In addition to purely statistical research, this step can involve contact with the ICE field office to better understand the characteristics of the jurisdictions.

### 3. Direct investigation

Where statistical analysis leaves open questions, or where ICE or CRCL have received a complaint meriting investigation, we will conduct direct, non-statistical inquiries.  Such an investigation may involve more traditional civil rights investigation tools, such as interviews with complainants, law enforcement, and local ICE personnel; review of documents requested from the agency or agencies involved; site visits; and related methods. DHS will also notify the Department of Justice of these inquiries at appropriate points.

We anticipate that law enforcement agencies will voluntarily cooperate with our investigations.  If necessary, additional tools exist to encourage cooperation, including adjustments to Secure Communities protocols for the relevant jurisdiction and using DHS's Title VI authority if appropriate.

# EXHIBIT B


**Homeland Security**

**Secure Communities: Statistical Monitoring**
(last revised Nov. 16, 2011)

The Secure Communities program works after fingerprints submitted by police to the FBI for checks against various criminal justice databases are checked in turn against Department of Homeland Security (DHS) databases, revealing which fingerprinted arrestees may be removable aliens. Usually in a matter of hours after fingerprinting, U.S. Immigration and Customs Enforcement (ICE) receives the names of possibly removable alien arrestees and can determine the appropriate immigration enforcement action. Secure Communities' principal tool for identification of such persons is its use of "IDENT/IAFIS interoperability"—a data conduit connecting the FBI's Integrated Automated Fingerprint Identification System (IAFIS) with DHS US-VISIT's Automated Biometric Identification System (IDENT).

The data and information available to DHS as a result of Secure Communities' use of IDENT/IAFIS interoperability offer a window into policing practices that may help identify potential civil rights problems linked to the program. DHS is committed to ensuring the Secure Communities program incorporates robust civil rights oversight. To that end, the DHS Office for Civil Rights and Civil Liberties (CRCL) and ICE have developed a three-part process for identifying jurisdictions in which further analysis and possibly oversight measures may be warranted:

- *Statistical monitoring* to detect anomalous jurisdictions;
- *Statistical analysis* to understand those anomalies; and
- *Direct investigation* of unresolved anomalies and civil rights complaints.

## A. Statistical monitoring

In June 2011 ICE Director John Morton and DHS Officer for Civil Rights and Civil Liberties Margo Schlanger announced DHS's plan for a quarterly review of Secure Communities-related statistics. This statistical monitoring initiative is conducted by CRCL staff and an academic expert in criminological statistics, assisted by ICE staff. The statistical monitoring is designed to identify jurisdictions with statistically anomalous data. These jurisdictions then receive additional, in-depth analysis. A statistical anomaly does ***not*** conclusively determine that the jurisdiction is making inappropriate or unlawful arrests. Some anomalies are likely to be pure artifacts of the limited data available, and not, upon examination, probative of improper practices.

The statistical metrics that have been designed for this initiative aim to identify a set of jurisdictions for additional analysis, based on the limited available information. The statistical monitoring relies on several forms of data available from federal sources:

- **Fingerprint submission** counts, reflecting all fingerprint submissions to the FBI's IAFIS in counties in which Secure Communities is activated;
- **Alien fingerprint match** counts, indicating that a fingerprint submission corresponds to a record of an alien in the DHS IDENT database;

- **American Community Survey (ACS)** data on the total and foreign-born population by jurisdiction, produced by the U.S. Census Bureau (we use the 5-year survey estimates, currently covering years 2005-09, and will update as new data are released); and

- **Uniform Crime Reports (UCR)** data on the number and types of arrests, by reporting agency, produced by the FBI as one of its national crime-reporting programs. The raw FBI data are adjusted to account for variation in coverage among agencies, and then categorized to approximately track the distinction between aggravated felonies and other arrests. (We use 2008 data, the latest analyzable dataset.)

We aggregate all data at the county level, and remove from the analysis counties with so few IDENT matches that meaningful statistical analysis is impossible. Results are then separated between larger (over 100,000 population) and smaller (under 100,000) counties, which tracks a county-size division used by the UCR. All counties that are activated in Secure Communities for at least one full quarter are analyzed. For states that do not participate in the UCR program, we substitute state-level crime reporting data, if data comparable to the UCR are available. When comparing quarterly Secure Communities data to annual UCR data, we divide the annual UCR figure by four to obtain an average quarterly value.

The purpose of the review is to choose appropriate jurisdictions for additional analysis; this will focus on jurisdictions that rank in the top ten among larger counties, or in the top five among smaller counties, on one of the first two metrics described here; rankings on the third metric primarily serve to check and prioritize among the jurisdictions that rank high on the first two metrics. To the extent resources permit, additional jurisdictions may also be analyzed further.

### 1. Foreign-born arrestee comparison

*Compares IDENT matches as a portion of all fingerprint submissions with foreign-born proportion of population*

Secure Communities' use of IDENT/IAFIS interoperability examines individuals whom IDENT identifies as aliens—"alien IDENT matches." IDENT records of known U.S. citizens are disregarded by Secure Communities.

The first data metric compares **the fraction of a county's arrestees who are alien IDENT matches to the fraction of the county's population that is foreign-born**, as determined by the ACS. We then rank jurisdictions by the extent to which the rate of alien IDENT matches exceeds the foreign-born population.

$$\text{Foreign Born Arrestee Comparison} = \frac{\frac{\text{IDENT Matches}}{\text{IAFIS Submissions}}}{\text{\% Foreign Born}}$$

For example, in a jurisdiction where 20% of submitted fingerprints lead to an alien IDENT match, but the underlying population is 5% foreign-born, this metric will be 4—and the jurisdiction will rank higher than a jurisdiction where 20% of arrests are IDENT matches but 10% of the population is foreign-born, for which the metric is 2. Jurisdictions that rank high on this measure seem appropriate for further analysis because those are the jurisdictions where aliens appear to constitute a significantly

greater fraction of the arrested population than they do of the general population. Sample data and calculations are provided in part 4, below.

This metric has four important limitations, the first two of which we are working to address across all jurisdictions, and the last two of which can be taken account of in followup analysis:

1. Sometimes individuals who are arrested and booked are fingerprinted more than once at different points in the criminal justice process. The rate at which individuals are fingerprinted multiple times in the process—and accordingly appear more than once in our data set—varies from place to place (although early review indicates that the variation is small), and could affect the ratio of matches to submissions in particular jurisdictions. We are investigating this duplication issue and may in the future adjust the metric to account for variations in duplication rates between counties. (The second metric, described below, is duplication-adjusted, which minimizes the impact of this data imperfection.)

2. IDENT does not cover the foreign-born population at a uniform rate across jurisdictions. Persons who have entered without inspection (as by illegally crossing the border between ports of entry), and have no prior encounter with federal immigration agencies, will generally not be in IDENT. Communities where such persons make up a higher percentage of aliens will have a lower IDENT match rate, relative to the total foreign-born population, than will communities where most foreign-born persons, including illegal aliens, entered after inspection (such as by overstaying after expiration of a visa). ICE is working to better understand variation in IDENT coverage of the foreign-born population.

3. In some jurisdictions, a substantial percentage of arrests may be individuals who reside outside the jurisdiction. These could include low-population jurisdictions where many arrests involve vehicles on a major thruway, urban jurisdictions where a significant fraction of arrestees live in adjacent jurisdictions but travel back and forth, or other patterns. A significant mismatch between the offender and resident populations could impact the metric, irrespective of particular policing practices, as a result of the comparison to the foreign-born *resident* population of the jurisdiction.

4. This metric could be skewed in jurisdictions that experienced a significant recent change in the foreign-born population that was not yet captured by the latest available ACS data.

**2. Foreign-born crime comparison**

*Compares alien arrest patterns to underlying crime rates*

Once a fingerprint submission is identified as an alien IDENT match, ICE's Law Enforcement Support Center (LESC) reviews additional databases to determine the individual's criminal history, for purposes of resource prioritization. The LESC flags individuals who have a prior confirmed conviction for an aggravated felony or are known to have just been arrested for an aggravated felony. ("Aggravated felony" is a term of art in immigration law.[1]) We utilize the LESC's limited separation of aggravated felonies from other felonies and misdemeanors for the second data metric; those aliens

---

[1] *See* 8 U.S.C. § 1101(a)(43) (defining "aggravated felony" to include a wide range of violent and non-violent crimes).

who have no known prior conviction for, or current arrest for, an aggravated felony are designated "LESC L2&3."

The second data metric compares **the number of IDENT-matched aliens arrested for non-aggravated felonies and misdemeanors (and with no prior conviction for an aggravated felony) to the jurisdiction's overall rate of such arrests, adjusted for the percentage of the jurisdiction's population that is foreign-born**. Patterns showing aliens are arrested at a high rate for minor crimes, relative to their proportion within the population and the underlying crime incidence may warrant further analysis.

$$\text{Foreign Born Crime Comparison} = \frac{\text{LESC L2\&L3}}{\frac{1}{4}\text{UCR NonAgg.Fel.Arrests} \times \text{\% Foreign Born}}$$

For example, suppose in one quarter County A has 50 IDENT matches for lesser crimes by aliens without a known aggravated felony conviction, that it usually has 500 total arrests for lesser crimes in a quarter (2000 in a year), and that its population is 2% foreign-born. So 1 in 10 lesser-crime arrests is of an alien whose fingerprints are in IDENT, even though only 1 in 50 people are foreign-born. This metric would therefore be 5. If in County B, the same rate of 1 in 10 lesser-crime arrests involves an alien, but the underlying population of County B is 10% foreign-born, this metric would be just 1. For counties that rank high with respect to this metric, the rate of alien arrests for crimes other than aggravated felonies appears disproportionate to the underlying population, which could stem from skewed police attention to lesser crimes committed by aliens, or from a variety of other circumstances.

This metric has five important limitations; again, we are taking each of these into account:

1. Although for this metric, we attempt to control for the duplication problem described as limitation (1) in the discussion of the first metric above, that ameliorates but does not eliminate duplication as an issue. Where possible, we reduce the duplication problem for the Foreign Born Crime Comparison by adjusting each jurisdiction's LESC L2&3 number by a duplication multiple (calculated by examining all of the IDENT matches in that jurisdiction in a nine-month period to identify multiple submissions[2]). Most jurisdictions have relatively similar duplication rates, so this adjustment materially affects the relative order of only a small fraction of jurisdictions.

   The duplication rate cannot be calculated for some jurisdictions for technical reasons related to the format in which they submit fingerprints to FBI ("National Fingerprint File" (NFF) states). For those jurisdictions, we adjust by the mean duplication rate from similarly-sized counties.

2. The mobile-population issue, described as limitation (3) of the first metric above.

---

[2] The nine-month window for determining when multiple fingerprint submissions are likely to have arisen from a single arrest rather than multiple arrests of the same individual was chosen as a reasonable assumption regarding the length of an arrest cycle. While a different time frame might yield somewhat different duplication results, the range of values is sufficiently small that we believe that the choice of de-duplication interval is not a significant factor in the rankings on this metric.

3. Aligning underlying crime data with the LESC's separation of aggravated felonies from other crimes is imperfect, as "aggravated felony" is not a category used by the UCR. Many offenses tracked by the UCR may or may not qualify as aggravated felonies in particular circumstances, but this metric necessarily makes a categorical distinction among UCR crimes.[3]

4. Not all counties participate in the UCR, and so may not have comparable underlying crime rates for us to review; we use other arrest data, where it is available and comparable to UCR, but some jurisdictions cannot be reviewed with this comparison.

5. The most significant limitation results from LESC's operational goal of responding to each Secure Communities inquiry within four hours, and the fact that the data the LESC receives directly from IDENT/IAFIS interoperability do not include any information on the crime for which the individual was arrested and fingerprinted. While the LESC attempts to obtain both prior criminal history and information on the instant arrest, its ability to obtain instant-arrest information in its limited window of time is highly constrained. As a result, some alien IDENT matches that result from an arrest for an aggravated felony are not categorized as Level 1 leads by the LESC (though ICE field agents escalate a case's priority once they obtain information on an aggravated felony arrest). And, conversely, some aliens are classified as Level 1 leads by LESC not because of their instant arrest, but because of a known *prior* conviction for an aggravated felony. ICE and the FBI are working on advanced software and data-flow procedures that will eventually enable the LESC to have closer to real-time information on the severity of instant arrests, but until that technology is available—in a few years—LESC data is of real but limited value in determining the *kinds* of arrests law enforcement agencies are making. ICE has, however, undertaken a short-term study to better estimate the proportion of aliens categorized as LESC L1 on each applicable basis. When that study is complete, we may be able to improve this metric.

**3. Identified alien crime severity comparison**

*Compares the severity of offenses among IDENT-identified arrested aliens with the severity among the entire population of arrestees*

The third metric compares the relative incidence of lesser crimes as a fraction of all crimes among the general population and the alien population. Like the second metric, the third metric utilizes the LESC's separation of alien IDENT matches with immediate arrests for, or readily available confirmed convictions for, aggravated felonies, from the other alien IDENT matches.

We compare **the ratio of less-serious crimes to all arrests in the IDENT matches to the comparable ratio in general crime data.**

$$\text{Identified Alien Crime Severity Comparison} = \frac{\left(\frac{\text{LESC L2\&L3}}{\text{IDENT Matches}}\right)}{\left(\frac{\text{UCR NonAgg.Fel.Arrests}}{\text{All UCR Arrests}}\right)}$$

---

[3] UCR categories DRGSALE, MURDER, RAPE, AGASSLT, ARSON, BURGLRY, ROBBERY, EMBEZL, and WEAPONS are mapped as aggravated felonies, and all other categories to other crimes.

Adding to the same County A figures used above, suppose County A has 50 IDENT matches for lesser crimes (by aliens without a prior aggravated felony conviction), out of 75 total IDENT matches. Among *all* arrests, as reported to the UCR, it has 500 total arrests for lesser crimes, out of 750 total crimes, in a year. Following the formula above, this metric would be 1. If County B has all the same figures, except that the total UCR arrests were 1000, this metric would be 1.33. If a county has a high rank on this metric, it could suggest that enforcement among aliens is particularly concentrated on minor crimes—arrests for which are more often (but not always) discretionary, and therefore the areas in which bias might occur. Again, however, there are many reasons for such a result, and the purpose of this tool is to identify jurisdictions for further analysis.

The formula used for this comparison has the advantage that it should not be affected by duplicate submissions of fingerprints at various points in the criminal justice process. Otherwise, however, it shares the limitations discussed for the second metric. Moreover, because of its sensitivity to small numbers, we only calculate this number for jurisdictions with at least 5 IDENT matches in the quarter. This metric is principally used to rank jurisdictions that have been identified through one of the prior two metrics; a jurisdiction that ranks highly only on this metric is unlikely to be a primary focus for further analysis at this time.

*   *   *

It is important to remember that *ranking* jurisdictions, which focuses on the differences among them, should compensate for some of the data issues described above. In addition, the monitoring we intend is not akin to an indictment or other declaration of wrongdoing but rather simply a nomination for additional analysis. To date, ICE and CRCL have been through two quarters of data. We used data from the second quarter of FY 2011 to refine the metrics; the third quarter of FY 2011 allowed the first use of the statistical monitoring methodology. We have begun follow-up steps (explained in section B below).

## 4. Sample Data and Calculations

The data and metrics are contained in a flat spreadsheet with one record per jurisdiction (county or county-equivalent). The sample data below illustrate the fields involved in the monitoring metrics described in this document. (The database also contains additional information on ICE activity.)

**Table 1. Sample data used for Secure Communities quarterly reviews**
*Sample data: These are not real counties.*

| State | County | Population | County Size | % Foreign-born Residents | Est. Agg. Felony Arrests | Est. Lesser Crime Arrests | Duplication Multiplier | Fingerprint Submissions (quarter) | LESC Level 1 (Agg. Felony) Matches (quarter) | LESC Level 2&3 (Other Felony/ Misdemeanor) Matches (quarter) |
|---|---|---|---|---|---|---|---|---|---|---|
| XX | Smith | 404,922 | large | 30.07% | 2,316 | 12,409 | 1.310 | 4,524 | 48 | 533 |
| XY | Ng | 332,059 | large | 10.09% | 1,719 | 8,755 | 1.662 | 2,899 | 11 | 70 |
| YZ | Greene | 177,685 | large | 17.77% | 446 | 4,272 | 1.122 | 1,723 | 11 | 109 |

These three large (and fictional) counties (population over 100,000) have certain similarities, but enough dissimilarities to be difficult to compare directly: Smith is twice as large as Greene, while Ng falls in the middle; but Smith has three times, and Greene nearly twice, the foreign-born population of Ng. Smith has the highest overall crime rate (36 crimes per thousand population), and Greene both the lowest (26 crimes per thousand) and the least serious (10% of crimes are aggravated felonies, compared to about 16% in Smith and Ng). But it is difficult to determine, just from the raw data, how the jurisdictions compare with respect to indicia of policing practices disproportionately directed at minor crimes by foreign-born persons.

We can then compute the metrics:

**Table 2. Sample Secure Communities monitoring metrics**
*Sample data: These are not real counties.*

| County | (1) Foreign-born Arrestee Comparison (quarter) | Foreign-born Crime Comparison, Raw (quarter) | (2) Foreign-born Crime Comparison, Deduplicated (quarter) | (3) Identified Alien Crime Severity Comparison |
|---|---|---|---|---|
| Smith | 0.427 | 0.571 | 0.436 | 1.1 |
| Ng | 0.277 | 0.317 | 0.191 | 1.04 |
| Greene | 0.392 | 0.574 | 0.512 | 1.1 |

Smith ranks highest on metric 1, while Greene ranks highest on metric 2. Smith and Greene rank comparably on metric 3. Our attention should focus on those two counties; metric 3 provides additional assurance that Ng is of less concern.

**5. Improvements Underway**

*Better real-time arrest data.* ICE does not currently receive analyzable data on the nature of the arrest for which a fingerprint submission is being made. In other words, we do not know in real time whether a submission is based on a traffic offense or a violent crime. Accordingly, we rely on follow-up ICE investigations to make that data available in ICE record systems. Improvements to ICE systems are now underway that will significantly improve real-time data on the crime prompting an arrest; our statistical detection tools will improve once that software, part of what ICE terms the Automated Threat Prioritization initiative, is in place, and the data passed to ICE through interoperability includes a data field on the offense prompting the instant arrest.

*De-duplication.* As noted above, one possible reason for anomalous arrests rates of certain types could be a local practice of running fingerprints at multiple stages of criminal justice processing. Systematically re-printing individuals would increase biometric submissions, relative to a jurisdiction that only submits prints once per arrestee, without reflecting any meaningful enforcement difference. Pursuing this issue requires cooperation and assistance from US-VISIT, the custodian of the IDENT database, as well as FBI, the custodian of the IAFIS database. That work is well underway.

p. 7

## B. Statistical analysis

Many of the statistical anomalies identified in the statistical monitoring procedure likely reflect local crime patterns and legitimate law-enforcement practices. Further statistical analysis will need to be conducted to determine how to account for those anomalous patterns.  For example, if a state LEA's mission primarily involves highway patrol, it should have a high rate of traffic stops relative to other arrests. Again, these investigations will be conducted with ICE's resources and assisted by an expert criminology statistician retained by CRCL.

Because research will require utilization of data collected by local or state authorities, each of whom have their own reporting requirements as to extent, frequency, data fields included, and the like,[4] it will need to be individualized for each jurisdiction. Because it is local, statistical analysis necessarily relies on a mosaic of data sources and a research design particularized to the enforcement and information environment. The primary goal for this research will be to obtain data to provide the most accurate possible assessment of LEA policing practice. We anticipate that in some cases data will be easily obtained in a form that is easily analyzed. In other situations it may be more expedient to move to a direct investigation simply because the data collection effort would take more resources than investigation itself.

ICE and CRCL are committed to the following steps:

- Compare current-quarter statistical metrics to results in other quarters
- Review ICE administrative arrest and removal statistics from the jurisdiction
- Identify any weaknesses in existing data (low or missing coverage for overall crime statistics)
- Conduct further database research on the jurisdiction, including:
  - Additional data on citizenship, other characteristics of the foreign-born population
  - Additional arrest and crime data, where available, including the FBI National Incident-Based Reporting System (NIBRS)
- For agencies that also participate in ICE's 287(g) program, review additional data submitted through that program
- ICE ERO contacts to the local Field Office to identify possible causes of the statistical anomaly, potentially including:
  - Changes in local law, policy, or political/law enforcement leadership
  - Demographic characteristics or changes not captured by Census Bureau data
  - Geographic features (proximity to other population centers, major highways, etc.)
  - Local data discovery and data entry practices
  - Perceptions of local policing practices, particularly with respect to minor crimes and with respect to racial/ethnic minorities

---

[4] For example, Florida does not fully participate in the FBI's UCR program, but provides very similar arrest data through its own Statistical Analysis Center. *See* Florida Department of Law Enforcement: Florida Statistical Analysis Center: Uniform Crime Reports, *at* http://www.fdle.state.fl.us/Content/getdoc/a324add7-5dd6-4201-9696-93bfd76bc36c/UCR-Home.aspx (last visited July 18, 2011).

- Review arrest and conviction history of individuals identified through Secure Communities, particularly those identified on the basis of a misdemeanor arrest
- Review news accounts, nongovernmental organization reports, and any complaints submitted to ICE or CRCL concerning law enforcement practices in the jurisdiction
- Determine relevant DHS jurisdiction under Title VI of the Civil Rights Act of 1964
- Notify Department of Justice that the jurisdiction is undergoing analysis

## C. Direct investigation

Where statistical analysis leaves open questions, or where ICE or CRCL have received a complaint meriting investigation, we will move to direct, non-statistical investigation.[5] The investigations will involve, as appropriate for each situation:

- Interviews with complainants;
- Cooperation with ICE, especially field office personnel, to understand jurisdiction- and LEA-specific factors;
- Requests for production of documents from the LEA being investigated (as well as, perhaps, related LEAs—such as a sheriff's department that runs the jail used by an LEA under investigation);
- Determination of DHS's Title VI jurisdiction over the subject LEA;
- Notification of the Department of Justice, Civil Rights Division; and
- Interviews, site visits, and other in-person investigative methods.

We anticipate that law enforcement agencies will voluntarily cooperate with our investigations. If necessary, additional tools exist for securing that may facilitate cooperation, including, potentially, adjustments to Secure Communities protocols for the relevant jurisdiction and using DHS's Title VI authority if appropriate.

---

[5] *See* Memorandum for All ICE and CRCL Personnel from Margo Schlanger, Officer for Civil Rights and Civil Liberties, and Gary Mead, Executive Associate Director, ICE, regarding Secure Communities Complaints Involving State or Local Law Enforcement Agencies (June 14, 2011), *at* http://www.ice.gov/doclib/secure-communities/pdf/complaintprotocol.pdf.

# EXHIBIT C

*Office for Civil Rights and Civil Liberties*
**U.S. Department of Homeland Security**
Washington, DC 20528



### Overview of CRCL/ICE Quarterly Statistical Monitoring of Secure Communities

Four times a year, beginning in June 2011, CRCL and ICE will examine Secure Communities data to identify law enforcement agencies that might be engaged in improper police practices. The data we analyze is best understood by tracking information through the Secure Communities process.  The initial metrics described here will be subject to iterative improvement, over time, as the data sources improve and as we come to understand which anomalies in the data can be hallmarks of law enforcement conduct meriting further examination.  We anticipate receiving stakeholder feedback, as well, to assist us in improving our monitoring techniques.

**Step 1: Fingerprint Submission**

The first piece of the data flow involved in Secure Communities is law enforcement agencies' **submission** of the fingerprints of individuals involved in the criminal justice process. These fingerprints are submitted to a state identification bureau, which transmits them to the Federal Bureau of Investigation (FBI) for comparison with a criminal-history database known as IAFIS (Integrated Automated Fingerprint Identification System).

It is important to recognize that a single individual may be fingerprinted by a single police department several times, as a result of repeated fingerprinting throughout the process (once at arrest, again at arraignment, and so forth).  This phenomenon varies among jurisdictions; some agencies fingerprint a defendant only once from arrest through sentencing, while others fingerprint a person as many as seven times.  Therefore, the number of submissions—at least for some agencies—is *not* a count of the number of arrests the agency made; instead, the volume of their submissions is much higher than their number of arrests.  In our data analysis, we will "de-duplicate"—or remove duplicate fingerprint submissions from—the data to arrive at a better estimate of the number of arrest-based fingerprint submissions.  (In so doing, we will unavoidably eliminate from the submission records many of those that accompanied arrests for people arrested more than once.)

**Step 2: Comparison to the IDENT database**

The next step in the Secure Communities process occurs when FBI transmits the **submissions** to a unit at DHS called US-VISIT (United States Visitor and Immigrant Status Indicator Technology).  At US-VISIT, the submissions are automatically compared to a second database, called IDENT (Automated Biometric Identification System).  The IDENT database contains fingerprint records for millions of individuals with prior immigration encounters, such as an application for a visa or a prior removal from the United States.

If submitted fingerprints match an non-U.S. citizen's IDENT record, that individual is an IDENT **match**. The ratio of matches to submissions for a given jurisdiction, over a period of time, is the **match rate**.

---

**Statistical Monitoring Tool 1: Match Rate**

For each jurisdiction, data from the U.S. Census (in particular, the American Community Survey), establishes the percentage of the population born outside the United States.  We examine whether the proportion of arrestees with an IDENT match in a given jurisdiction differs markedly from census estimate of foreign-born percentage.  A very high IDENT match rate—more than twice the census foreign-born percentage—could be a "yellow flag" that police are concentrating law enforcement activities in immigrant communities, and so could be the basis for further inquiry.

---

**Step 3: Review of Criminal History of IDENT matches**

An IDENT match is not a determination that immigration enforcement activity should occur.  It's simply a lead, on which ICE can do additional work to decide whether the alien in question is removable, and whether such a removal would be an appropriate use of ICE resources.

All of the individuals with an IDENT record are referred to ICE's Law Enforcement Support Center (LESC), which looks at other databases to quickly review the individual's criminal history and

immigration status.  LESC identifies individuals who, from its limited information, have either previously been convicted for, or have just been arrested for, an **aggravated felony—**a set of felonies defined by federal immigration law.  The LESC then transmits information on aliens who appear to be removable to ICE field offices, along with an indication whether the alien appears to have an aggravated felony history. **NOTE:** The FBI-created "federal rap sheet" on which LESC relies for the criminal history does not always include full data on convictions, and details of the most recent arrests take time to arrive, so this part of the process proceeds without full information.

> **Statistical Monitoring Tool 2: Match Volumes by Seriousness of Criminal History**
>
> Using FBI data on crime within each jurisdiction—the Uniform Crime Reports (UCR)—we expect a certain ratio of aggravated felony arrests to other arrests. By comparing that ratio to the aggravated felonies identified by LESC within the set of potentially removable aliens, we can identify jurisdictions that appear to be arresting an anomalous proportion of lower-level alien offenders. Jurisdictions whose IDENT matches show an unusually high proportion of lower-level offenders, relative to that jurisdiction's crime patterns and demographics, may merit a closer examination.

## Step 4: Administrative Arrest

If ICE chooses to pursue removal against an individual identified in Step 3 and referred to a field office, it will administratively arrest him or her and commence removal proceedings. At this point, the individual's criminal history is assigned to a category, in accordance with ICE's removal priorities: **Level 1** for persons convicted of an aggravated felony, or two or more other felonies; **Level 2** for persons with one other felony, or three or more misdemeanor, convictions; and **Level 3** for persons with only two or fewer misdemeanor convictions. ICE also pursues **non-criminal immigration violators;** that is, individuals subject to removal with no criminal conviction documented in ICE's system or the federal rap sheet.

## Step 5: Removal and Return

Upon the conclusion of removal proceedings, a removable alien will be removed; or the alien may take voluntary departure prior to, or at the conclusion of, removal proceedings. Which aliens are removed at the end of this process does not directly correspond to the population arrested, of course, because of the many points in between where prosecutorial discretion and other case-specific factors will play a role. But biased arrest patterns might influence the set of aliens removed.

Two important caveats:  First, many of the identified "non-criminal immigration violators" actually *do* have criminal convictions that are not in federal records, and many more may fit within ICE priorities for reasons other than their criminal history, such as a prior removal or failure to appear for an immigration proceeding. Second, because of data entry delays, it is common for an alien to be removed before the tracking database reflects a conviction on the most recent arrest (although not before the ICE enforcement officer knows about the conviction).  Therefore, over the weeks and months following removal, aliens initially recorded as non-criminal removals are often reclassified into a criminal history category based on their last arrest and conviction.

> **Statistical Monitoring Tool 3: Removal Proportions**
>
> Using ICE's removal data, we can compare the rates of misdemeanant and non-criminal immigration violator removals.  Jurisdictions with high rates of those lower-priority removals could merit further examination to see if the removal rates are being driven by distorted arrest rates not detected through other metrics.

Once a jurisdiction is identified as meriting further examination, because of one of these three monitoring indicators, the next steps are to use additional data sources to look at that jurisdiction's arrest and enforcement patterns, and possibly to conduct a factual investigation in the field.

# EXHIBIT D

**U.S. Department of Homeland Security**
Washington, DC 20528



**Homeland Security**

June 14, 2011

MEMORANDUM FOR:     All ICE and CRCL Personnel

FROM:     Margo Schlanger *Margo Schlanger*
Officer for Civil Rights and Civil Liberties
Department of Homeland Security

Gary Mead
Executive Associate Director
U.S. Immigration and Customs Enforcement

SUBJECT:     Secure Communities Complaints Involving State or Local Law
Enforcement Agencies

This memorandum sets out how the Department of Homeland Security (DHS) Office for Civil Rights and Civil Liberties (CRCL) and U.S. Immigration and Customs Enforcement (ICE) will address civil rights complaints involving state and local law enforcement and ICE's Secure Communities program.

## I. STRATEGY

Pursuant to CRCL's mandate to "oversee compliance with constitutional, statutory, regulatory, policy, and other requirements relating to the civil rights and civil liberties of individuals affected by the programs and activities of the Department," 6 U.S.C. § 345(a)(4), CRCL's Compliance Branch will investigate complaints of racial/ethnic discrimination or profiling or other civil rights or civil liberties allegations regarding state and local law enforcement agencies' conduct in jurisdictions in which ICE's Secure Communities program has been activated.

Secure Communities differs from most other programs involved in CRCL investigations insofar as civil rights or civil liberties allegations relating to Secure Communities may concern claims of misconduct by state or local law enforcement officers or agencies, not DHS employees or contractors. Unlike with its 287(g) program, ICE need not have a formal partnership with the local law enforcement agencies whose arrests trigger an information flow to ICE through Secure Communities. CRCL will, therefore, often lack a compulsory process or the ability to *require* state and local law enforcement agencies to cooperate in our investigations. Based on varied factors and relationships, CRCL and ICE  will strive to obtain the level of state and local law enforcement agency cooperation needed and ICE will assist in CRCL's investigations, including promoting such cooperation.  The tools identified below will promote production of documents and witnesses when necessary (see Part II.D below).

This process is useful to ensure that DHS's activities do not function as a conduit or incentive for discriminatory policing, but it is important to note (and ICE will state, if asked) that DHS/ICE oversight of Secure Communities does not put DHS or ICE in a position to superintend all law enforcement conduct in jurisdictions where Secure Communities has been activated. It remains the responsibility of each jurisdiction to abide by its constitutional obligation to avoid discriminatory policing. Many civil rights and/or community policing mechanisms that may assist in fulfilling that responsibility have nothing to do with Secure Communities or immigration enforcement. Accordingly, DHS will not discourage development or use of such mechanisms.

## II. INVESTIGATION PROCESS

Three potential informational sources could lead to a CRCL investigation related to Secure Communities: (1) complaints alleging misconduct with respect to identifiable individuals or groups, or a specific law enforcement agency or agencies, received through the CRCL complaint line or email box or through referral from ICE; (2) statistical anomalies ("yellow flags") recognized through standing quarterly reviews of Secure Communities data by ICE and CRCL; and (3) third-party research, such as non-governmental organization (NGO) reports or systematic media investigations. The appropriate response will generally follow somewhat different pathways.

ICE will in the first instance direct potential complainants to file their complaint with CRCL, as is now done through a notice on the Secure Communities web site. Where ICE receives a civil rights complaint concerning Secure Communities directly, its first step will be to forward the complaint to CRCL for processing under the methods described here. In an exceptional case requiring immediate ICE investigation (such as a credible allegation of a practice posing an immediate threat to life or safety), ICE will promptly notify CRCL of the complaint and facilitate CRCL's participation in its own investigation.

This memorandum addresses complaints exclusively or principally concerning conduct by a state or local law enforcement agency in a situation involving Secure Communities. For Secure Communities civil rights complaints also alleging misconduct by ICE employees or contractors, CRCL will follow its standard procedures for investigating or, as appropriate, referring investigations to the ICE Office of Professional Responsibility (OPR) through the Joint Intake Center (JIC).

ICE and CRCL may also receive nonspecific or programmatic allegations about Secure Communities that cannot form the basis for a further investigation—a general claim from a member of the public that the initiative promotes civil rights abuses, for example. It will generally be appropriate for the recipient, whether ICE or CRCL, to respond to such nonspecific allegations through its established process for addressing such correspondence, without implicating this protocol. ICE and CRCL will, however, collaborate on any such correspondence calling for a considered and coordinated response.

2

## A. Secure Communities complaints

Upon receipt of a complaint about Secure Communities regarding identifiable persons or groups in connection with specific law enforcement agencies, CRCL's Compliance Branch will generally take the following steps:

1. *Notify Secure Communities* personnel that the investigation has been initiated. If the complaint involves significant allegations against ICE employees or contractors, ICE will follow standard procedure for DHS civil rights complaints, including coordination with ICE OPR.

2. *Research available law enforcement databases*, in particular ICE's ENFORCE and the information available through FBI's National Crime Information Center (NCIC), and regular statistical reporting on Secure Communities. This step seeks information about both the individuals and encounters identified in the complaint and about the conduct of the agency or agencies involved based on statistical reporting.

3. *Interview the individuals identified in the complaint* and review any documents they provide.

4. *Work with ICE* to understand the law enforcement agency or agencies that are the subject of the complaint. This step will vary from case to case, but could include interviewing an ICE field officer or field office director and requesting documents from the field office.

5. In some cases, *make a limited document request* to the law enforcement agency for items such as the arrest files on the identified individuals.

6. *Determine DHS's Title VI jurisdiction* by researching whether the subject of the complaint is a recipient or sub-recipient of DHS grants.

7. *Notify the Department of Justice Civil Rights Division* of the investigation.

8. *Jointly investigate* the law enforcement agency in question with ICE if a case is opened in the ICE Joint Integrity Case Management System (JICMS). If there is no JICMS case, depending upon the circumstances, CRCL will jointly investigate with ICE or will investigate independently. This step could include interviews with officers of the jurisdiction in question, further document requests, site visits, examination of data sets held by the agency, etc. Where there are allegations regarding ICE employees or contractors, CRCL will coordinate as appropriate with ICE Office of Professional Responsibility (OPR).

9. *Prepare findings* (in conjunction with ICE if a joint investigation), if appropriate.

10. *Prepare recommendations* to ICE and/or the subject of the complaint. The scope of possible recommendations is discussed further below.

11. *Notify DOJ of the results of the investigation.*

Some of these steps may happen simultaneously, and the process may be pretermitted if an allegation is determined non-credible, or does not suggest a problem, at an earlier step. Note that different types of Secure Communities complaints may principally involve either the *arresting* agency (usually a police department) or the *detaining* agency (often a county sheriff operating a

3

jail), but we may seek information from the counterpart (arresting or detaining) agency even where no allegation of misconduct attaches to it directly.

## B. Statistical anomalies

ICE and CRCL will jointly design and review regular reports (generated at least once a quarter) to detect anomalies in arrest patterns or other police conduct in enrolled jurisdictions. These anomalies, the definition of which will require significant further development beyond the scope of this document, might surface as deviations from expected benchmarks, or sharp changes in a jurisdiction's statistics without a ready explanation. If a "yellow flag" anomaly is identified that warrants further examination, CRCL will:

1. *Collaborate with ICE* regarding the anomaly and request information from the field office on what might be causing it.

2. *Conduct further database research* on the jurisdiction in question, along the lines of a "root cause analysis." This research will attempt to gather more particularized data than is captured by quarterly reports, and could include geographical detail, numeric identifiers, or other analysis to identify the cause of the anomaly.

3. If these steps cannot resolve the anomaly, CRCL may:

   a. *Open a deeper statistical investigation* and invite ICE to partner in the investigation; and/or

   b. *Examine non-database sources* to provide concrete facts on which to research the agency's conduct. These could be complaints raised by NGOs, in media reports, or in correspondence with the Department that had not prompted us to open a formal investigation in the absence of the statistical anomaly.

4. *Determine DHS's Title VI jurisdiction* by researching whether the subject of the investigation is a recipient or subrecipient of DHS grants.

5. *Notify the DOJ Civil Rights Division* of our investigation.

6. Depending upon the circumstances, *investigate* the anomaly jointly with ICE, or independently. This step could include interviews with officers of the jurisdiction in question, further document requests, site visits, etc.

7. *Prepare findings* (in conjunction with ICE if a joint investigation), if appropriate.

8. *Prepare recommendations* to ICE and/or the subject of the anomaly. The scope of possible recommendations is discussed further below.

9. *Revise quarterly statistical review protocol* in light of lessons learned.

10. *Notify DOJ of the results of the investigation.*

## C. Other external data

Both CRCL and ICE may receive or come to be aware of other sources of non-government data and research that may facilitate oversight of Secure Communities. ICE and CRCL will consider

4

appropriate follow-up action to such research on a case-by-case basis. Where outside research involves a limited number of specified jurisdictions, a follow-up investigation, if appropriate, would generally follow the protocol for investigating statistical anomalies, as set forth in part (B) above, beginning at step 2.

### D. Noncooperation

We anticipate that law enforcement agencies will voluntarily cooperate with our investigations. If necessary, additional tools exist that may facilitate cooperation, including, potentially, adjustments to Secure Communities protocols for the relevant jurisdiction and using DHS's Title VI authority if appropriate.  (See 6 C.F.R. § 21.9(c) ("Each recipient [of DHS financial support] shall permit access by the Secretary during normal business hours to such of its books, records, accounts, and other sources of information, and its facilities as may be pertinent to ascertain compliance with [DHS Title VI antidiscrimination regulations].").

## III. RECOMMENDATIONS, REFERRALS, AND REMEDIES

On a case by case basis, responding to the particular situation, if CRCL finds civil rights or civil liberties problems in the course of an investigation, CRCL will provide recommendations, and may refer the investigation to other government bodies with additional oversight authority. Recommendations may encompass:

- Increased officer training and/or oversight on civil rights and civil liberties issues.
- Identification of law enforcement officers who may require disciplinary investigation.
- Referral of matters to state or local authorities, such as state attorneys general or police oversight bodies.
- Referral of significant matters to the U.S. Department of Justice, Civil Rights Division for possible criminal investigation under 18 U.S.C. § 242 or other authorities, or civil litigation under 42 U.S.C. § 14141 or other authorities.
- Prospective inquiry, scrutiny, and/or requested reporting by the agency, which may require the collection of additional information on police conduct, including individualized data on individuals stopped or arrested by the agency.
- Changes to ICE's administration of the Secure Communities program for the individual jurisdiction, if appropriate.
- Improvements to the oversight of the Secure Communities program.
- Restrictions or cancellation of DHS grants to the agency pursuant to the DHS Title VI regulations, if appropriate.

# EXHIBIT E

Secretary
**U.S. Department of Homeland Security**
Washington, DC 20528



November 20, 2014

MEMORANDUM FOR:    Thomas S. Winkowski
Acting Director
U.S. Immigration and Customs Enforcement

Megan Mack
Officer
Office of Civil Rights and Civil Liberties

Philip A. McNamara
Assistant Secretary for Intergovernmental Affairs

FROM:    Jeh Charles Johnson
Secretary

SUBJECT:    **Secure Communities**

==The Secure Communities program, as we know it, will be discontinued.==

The goal of Secure Communities was to more effectively identify and facilitate the removal of criminal aliens in the custody of state and local law enforcement agencies. But the reality is the program has attracted a great deal of criticism, is widely misunderstood, and is embroiled in litigation; its very name has become a symbol for general hostility toward the enforcement of our immigration laws. Governors, mayors, and state and local law enforcement officials around the country have increasingly refused to cooperate with the program, and many have issued executive orders or signed laws prohibiting such cooperation. A number of federal courts have rejected the authority of state and local law enforcement agencies to detain immigrants pursuant to federal detainers issued under the current Secure Communities program.

The overarching goal of Secure Communities remains in my view a valid and important law enforcement objective, but a fresh start and a new program are necessary. As recommended by the Homeland Security Advisory Council Task Force, Secure Communities "must be implemented in a way that supports community policing and sustains the trust of all elements of the community in working with local law enforcement."

1

Accordingly, I am directing U.S. Immigration and Customs Enforcement (ICE) to discontinue Secure Communities. ICE should put in its place a program that will continue to rely on fingerprint-based biometric data submitted during bookings by state and local law enforcement agencies to the Federal Bureau of Investigation for criminal background checks. However, ICE should only seek the transfer of an alien in the custody of state or local law enforcement through the new program when the alien has been convicted of an offense listed in Priority 1 (a), (c), (d), and (e) and Priority 2 (a) and (b) of the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum, or when, in the judgment of an ICE Field Office Director, the alien otherwise poses a danger to national security. In other words, unless the alien poses a demonstrable risk to national security, enforcement actions through the new program will only be taken against aliens who are convicted of specifically enumerated crimes.

Further, to address the increasing number of federal court decisions that hold that detainer-based detention by state and local law enforcement agencies violates the Fourth Amendment,[1] I am directing ICE to replace requests for <u>detention</u> (*i.e.,* requests that an agency hold an individual beyond the point at which they would otherwise be released) with requests for <u>notification</u> (*i.e.*, requests that state or local law enforcement notify ICE of a pending release during the time that person is otherwise in custody under state or local authority).

If in special circumstances ICE seeks to issue a request for detention (rather than a request for notification), it must specify that the person is subject to a final order of removal or there is other sufficient probable cause to find that the person is a removable alien, thereby addressing the Fourth Amendment concerns raised in recent federal court decisions.

---

[1] *See, e.g., Miranda-Olivares*, 2014 WL 1414305, at *11 (D. Ore. Apr. 11, 2014) (holding that county violated the Fourth Amendment by relying on an ICE detainer that did not provide probable cause regarding removability); *Morales v. Chadbourne*, 996 F. Supp. 2d 19, 29 (D.R.I. 2014) (concluding that detention pursuant to an immigration detainer "for purposes of mere investigation is not permitted"). *See also Moreno v. Napolitano*, Case No. 11 C 5452, 2014 WL 4814776 (N.D. Ill. Sept. 29, 2014) (denying judgment on the pleadings to the government on plaintiffs' claim that ICE's detainer procedures violate probable cause requirements); *Gonzalez v. ICE*, Case No. 2:13-cv-0441-BRO-FFM, at 12-13 (C.D. Cal. July 28, 2014) (granting the government's motion to dismiss, but allowing plaintiffs to file an amended complaint and noting that plaintiffs "have sufficiently pleaded that Defendants exceeded their authorized power" by issuing "immigration detainers without probable cause resulting in unlawful detention"); *Villars v. Kubiatoski*, --- F. Supp. 2d ----, 2014 WL 1795631, at * 10 (N.D. Ill. May 5, 2014) (rejecting dismissal of Fourth Amendment claims concerning an ICE detainer issued "without probable cause that Villars committed a violation of immigration laws"); *Galarza v. Szalczyk*, Civ. Action No. 10-cv-06815, 2012 WL 1080020, at *14 (E.D. Penn. March 30, 2012) (denying qualified immunity to immigration officials for unlawful detention on an immigration detainer issued without probable cause), rev'd and remanded on other grounds, 745 F.3d 634 (reversing district court's finding of no municipal liability); *Uroza v. Salt Lake City*, No. 2:11CV713DAK, 2013 WL 653968, at *6-7 (D. Utah Feb. 21, 2013) (denying dismissal on qualified immunity grounds where plaintiff claimed to have been held on an immigration detainer issued without probable cause). *Cf. Makowski v. United States*, --- F. Supp. 2d ---, 2014 WL 1089119, at *10 (N.D. Ill. 2014) (concluding that plaintiff stated a plausible false imprisonment claim against the United States where he was held on a detainer without probable cause).

This new program should be referred to as the "Priority Enforcement Program" or "PEP."

Nothing in this memorandum shall prevent ICE from seeking the transfer of an alien from a state or local law enforcement agency when ICE has otherwise determined that the alien is a priority under the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum and the state or locality agrees to cooperate with such transfer. DHS will monitor these activities at the state and local level, including through the collection and analysis of data, to detect inappropriate use to support or engage in biased policing, and will establish effective remedial measures to stop any such misuses.[2]  I direct the Office of Civil Rights and Civil Liberties to develop and implement a plan to monitor state and local law enforcement agencies participating in such transfers.

Finally, acquainting state and local governments, and their law enforcement components, with this policy change will be crucial to its success.  I therefore direct the Assistant Secretary for Intergovernmental Affairs to formulate a plan and coordinate an effort to engage state and local governments about this and related changes to our enforcement policies.  I am willing to personally participate in these discussions.

---

[2] *See* Homeland Security Advisory Council, *Task Force on Secure Communities Findings and Recommendations,* September 2011.

# EXHIBIT F



*Office for Civil Rights and Civil Liberties*
**U.S. Department of Homeland Security**
Washington, DC 20528

**Monitoring and Addressing Civil Rights Complaints and Concerns Arising from Transfers to ICE from State or Local Law Enforcement**

- On November 20, 2014, Secretary of Homeland Security Johnson issued a memorandum entitled *Secure Communities*, directing U.S. Immigration and Customs Enforcement (ICE) to discontinue the Secure Communities program and to put in its place the Priority Enforcement Program (PEP).

- PEP relies on fingerprint-based biometric data, submitted during bookings by state and local law enforcement agencies (LEAs) to the Federal Bureau of Investigation, to identify priority aliens in LEA custody for potential enforcement action. PEP and the DHS enforcement priorities serve to significantly limit the potential for civil rights and civil liberties abuses in the identification of individuals in LEA custody for transfer to ICE for potential civil immigration enforcement.

- LEAs may cooperate in the transfer of priority aliens outside the PEP framework as well, as recognized in the *Secure Communities* memorandum.  Recognizing the need to support community policing and maintain community trust, Secretary Johnson directed that DHS, pursuant to a plan developed by the Office for Civil Rights and Civil Liberties (CRCL), monitor these activities, including through the collection and analysis of data, to detect inappropriate use to support or engage in biased policing, and to establish effective remedial measures to stop any such misuses.

- CRCL has authority to investigate whether federal immigration enforcement activities, including those initiated based upon criminal arrests by state and local LEAs, may serve as a conduit for improper policing activities by those LEAs. CRCL investigates, identifies, and reports on areas of concern to develop relevant facts and, where necessary, to establish effective remedial measures, with respect to aliens who are transferred to ICE custody following an arrest by an LEA.

**Identification of Concerns and Monitoring Transfers**

- Civil rights concerns regarding the use of transfers to ICE by state or local LEAs to support or engage in biased policing may come to the attention of ICE or CRCL through several channels, including:

- o *Notification of individual complaints:* Allegations of improper LEA conduct that led to an individual's criminal arrest and subsequent transfer to ICE custody, such as profiling on the basis of race, ethnicity, or limited English proficiency;

- o *Community and public concerns:* External stakeholders, including nongovernmental organizations, advocates, or media representatives, may provide reliable information indicating improper LEA practices; and

- o *Statistical monitoring:* CRCL's analysis of information routinely collected by ICE may identify patterns or trends consistent with improper police practices, warranting additional review.

- Allegations by the public of this nature should be directed to CRCL's Compliance Branch (information on filing complaints is at www.dhs.gov/file-civil-rights-complaint). Where ICE receives an allegation of improper LEA conduct, or identifies information suggesting improper police practices, ICE will refer that information to CRCL.

- CRCL will regularly monitor (both PEP and non-PEP) transfers from LEAs to ICE for civil immigration enforcement through statistical modeling. CRCL will use information including biometric submission and match data through PEP as well as other ICE data on prioritization of aliens encountered and enforcement actions taken.

**Assessing and Responding to Civil Rights Concerns**

- CRCL will regularly assess civil rights concerns at the state, county, and individual law enforcement agency levels, using all available and lawful means to identify when concerns arise from allegations of biased policing, misuse of federal information systems, or any other allegation of improper LEA practices that may impact federal immigration enforcement. However, CRCL's legal and practical authority to investigate the activities of LEAs (as distinct from entities within DHS) is limited.

- Where CRCL develops a concern about transfers by a jurisdiction's LEAs, it will meet with ICE to consider the basis for the concern and appropriate adaptive or remedial action. The Deputy Secretary of Homeland Security, ICE, and CRCL will collaborate on appropriate responses to significant concerns, with public outreach and engagement wherever feasible.

- If CRCL assesses or develops a good-faith basis to conclude that an LEA participating in transfers to ICE may be in violation of federal civil rights law, including but not limited to 42 U.S.C. § 14141, it will notify the U.S. Department of Justice, Civil Rights Division. CRCL may also communicate similar concerns to state attorneys general or other entities with appropriate jurisdiction.