# EXHIBIT 6



U.S. Department of Homeland Security
Washington, DC 20528

June 14, 2011

MEMORANDUM FOR:   All ICE and CRCL Personnel

FROM:   Margo Schlanger
Officer for Civil Rights and Civil Liberties
Department of Homeland Security

Gary Mead
Executive Associate Director
U.S. Immigration and Customs Enforcement

SUBJECT:   Secure Communities Complaints Involving State or Local Law Enforcement Agencies

This memorandum sets out how the Department of Homeland Security (DHS) Office for Civil Rights and Civil Liberties (CRCL) and U.S. Immigration and Customs Enforcement (ICE) will address civil rights complaints involving state and local law enforcement and ICE's Secure Communities program.

## I. STRATEGY

Pursuant to CRCL's mandate to "oversee compliance with constitutional, statutory, regulatory, policy, and other requirements relating to the civil rights and civil liberties of individuals affected by the programs and activities of the Department," 6 U.S.C. § 345(a)(4), CRCL's Compliance Branch will investigate complaints of racial/ethnic discrimination or profiling or other civil rights or civil liberties allegations regarding state and local law enforcement agencies' conduct in jurisdictions in which ICE's Secure Communities program has been activated.

Secure Communities differs from most other programs involved in CRCL investigations insofar as civil rights or civil liberties allegations relating to Secure Communities may concern claims of misconduct by state or local law enforcement officers or agencies, not DHS employees or contractors. Unlike with its 287(g) program, ICE need not have a formal partnership with the local law enforcement agencies whose arrests trigger an information flow to ICE through Secure Communities. CRCL will, therefore, often lack a compulsory process or the ability to *require* state and local law enforcement agencies to cooperate in our investigations. Based on varied factors and relationships, CRCL and ICE will strive to obtain the level of state and local law enforcement agency cooperation needed and ICE will assist in CRCL's investigations, including promoting such cooperation. The tools identified below will promote production of documents and witnesses when necessary (see Part II.D below).

This process is useful to ensure that DHS's activities do not function as a conduit or incentive for discriminatory policing, but it is important to note (and ICE will state, if asked) that DHS/ICE oversight of Secure Communities does not put DHS or ICE in a position to superintend all law enforcement conduct in jurisdictions where Secure Communities has been activated. It remains the responsibility of each jurisdiction to abide by its constitutional obligation to avoid discriminatory policing. Many civil rights and/or community policing mechanisms that may assist in fulfilling that responsibility have nothing to do with Secure Communities or immigration enforcement. Accordingly, DHS will not discourage development or use of such mechanisms.

## II. INVESTIGATION PROCESS

Three potential informational sources could lead to a CRCL investigation related to Secure Communities: (1) complaints alleging misconduct with respect to identifiable individuals or groups, or a specific law enforcement agency or agencies, received through the CRCL complaint line or email box or through referral from ICE; (2) statistical anomalies ("yellow flags") recognized through standing quarterly reviews of Secure Communities data by ICE and CRCL; and (3) third-party research, such as non-governmental organization (NGO) reports or systematic media investigations. The appropriate response will generally follow somewhat different pathways.

ICE will in the first instance direct potential complainants to file their complaint with CRCL, as is now done through a notice on the Secure Communities web site. Where ICE receives a civil rights complaint concerning Secure Communities directly, its first step will be to forward the complaint to CRCL for processing under the methods described here. In an exceptional case requiring immediate ICE investigation (such as a credible allegation of a practice posing an immediate threat to life or safety), ICE will promptly notify CRCL of the complaint and facilitate CRCL's participation in its own investigation.

This memorandum addresses complaints exclusively or principally concerning conduct by a state or local law enforcement agency in a situation involving Secure Communities. For Secure Communities civil rights complaints also alleging misconduct by ICE employees or contractors, CRCL will follow its standard procedures for investigating or, as appropriate, referring investigations to the ICE Office of Professional Responsibility (OPR) through the Joint Intake Center (JIC).

ICE and CRCL may also receive nonspecific or programmatic allegations about Secure Communities that cannot form the basis for a further investigation—a general claim from a member of the public that the initiative promotes civil rights abuses, for example. It will generally be appropriate for the recipient, whether ICE or CRCL, to respond to such nonspecific allegations through its established process for addressing such correspondence, without implicating this protocol. ICE and CRCL will, however, collaborate on any such correspondence calling for a considered and coordinated response.

## A. Secure Communities complaints

Upon receipt of a complaint about Secure Communities regarding identifiable persons or groups in connection with specific law enforcement agencies, CRCL's Compliance Branch will generally take the following steps:

1. *Notify Secure Communities* personnel that the investigation has been initiated. If the complaint involves significant allegations against ICE employees or contractors, ICE will follow standard procedure for DHS civil rights complaints, including coordination with ICE OPR.

2. *Research available law enforcement databases*, in particular ICE's ENFORCE and the information available through FBI's National Crime Information Center (NCIC), and regular statistical reporting on Secure Communities. This step seeks information about both the individuals and encounters identified in the complaint and about the conduct of the agency or agencies involved based on statistical reporting.

3. *Interview the individuals identified in the complaint* and review any documents they provide.

4. *Work with ICE* to understand the law enforcement agency or agencies that are the subject of the complaint. This step will vary from case to case, but could include interviewing an ICE field officer or field office director and requesting documents from the field office.

5. In some cases, *make a limited document request* to the law enforcement agency for items such as the arrest files on the identified individuals.

6. *Determine DHS's Title VI jurisdiction* by researching whether the subject of the complaint is a recipient or sub-recipient of DHS grants.

7. *Notify the Department of Justice Civil Rights Division* of the investigation.

8. *Jointly investigate* the law enforcement agency in question with ICE if a case is opened in the ICE Joint Integrity Case Management System (JICMS). If there is no JICMS case, depending upon the circumstances, CRCL will jointly investigate with ICE or will investigate independently. This step could include interviews with officers of the jurisdiction in question, further document requests, site visits, examination of data sets held by the agency, etc. Where there are allegations regarding ICE employees or contractors, CRCL will coordinate as appropriate with ICE Office of Professional Responsibility (OPR).

9. *Prepare findings* (in conjunction with ICE if a joint investigation), if appropriate.

10. *Prepare recommendations* to ICE and/or the subject of the complaint. The scope of possible recommendations is discussed further below.

11. *Notify DOJ of the results of the investigation.*

Some of these steps may happen simultaneously, and the process may be pretermitted if an allegation is determined non-credible, or does not suggest a problem, at an earlier step. Note that different types of Secure Communities complaints may principally involve either the *arresting* agency (usually a police department) or the *detaining* agency (often a county sheriff operating a

3

jail), but we may seek information from the counterpart (arresting or detaining) agency even where no allegation of misconduct attaches to it directly.

### B. Statistical anomalies

ICE and CRCL will jointly design and review regular reports (generated at least once a quarter) to detect anomalies in arrest patterns or other police conduct in enrolled jurisdictions. These anomalies, the definition of which will require significant further development beyond the scope of this document, might surface as deviations from expected benchmarks, or sharp changes in a jurisdiction's statistics without a ready explanation. If a "yellow flag" anomaly is identified that warrants further examination, CRCL will:

1. *Collaborate with ICE* regarding the anomaly and request information from the field office on what might be causing it.
2. *Conduct further database research* on the jurisdiction in question, along the lines of a "root cause analysis." This research will attempt to gather more particularized data than is captured by quarterly reports, and could include geographical detail, numeric identifiers, or other analysis to identify the cause of the anomaly.
3. If these steps cannot resolve the anomaly, CRCL may:
   a. *Open a deeper statistical investigation* and invite ICE to partner in the investigation; and/or
   b. *Examine non-database sources* to provide concrete facts on which to research the agency's conduct. These could be complaints raised by NGOs, in media reports, or in correspondence with the Department that had not prompted us to open a formal investigation in the absence of the statistical anomaly.
4. *Determine DHS's Title VI jurisdiction* by researching whether the subject of the investigation is a recipient or subrecipient of DHS grants.
5. *Notify the DOJ Civil Rights Division* of our investigation.
6. Depending upon the circumstances, *investigate* the anomaly jointly with ICE, or independently. This step could include interviews with officers of the jurisdiction in question, further document requests, site visits, etc.
7. *Prepare findings* (in conjunction with ICE if a joint investigation), if appropriate.
8. *Prepare recommendations* to ICE and/or the subject of the anomaly. The scope of possible recommendations is discussed further below.
9. *Revise quarterly statistical review protocol* in light of lessons learned.
10. *Notify DOJ of the results of the investigation.*

### C. Other external data

Both CRCL and ICE may receive or come to be aware of other sources of non-government data and research that may facilitate oversight of Secure Communities. ICE and CRCL will consider

4

appropriate follow-up action to such research on a case-by-case basis. Where outside research involves a limited number of specified jurisdictions, a follow-up investigation, if appropriate, would generally follow the protocol for investigating statistical anomalies, as set forth in part (B) above, beginning at step 2.

### D. Noncooperation

We anticipate that law enforcement agencies will voluntarily cooperate with our investigations. If necessary, additional tools exist that may facilitate cooperation, including, potentially, adjustments to Secure Communities protocols for the relevant jurisdiction and using DHS's Title VI authority if appropriate. (See 6 C.F.R. § 21.9(c) ("Each recipient [of DHS financial support] shall permit access by the Secretary during normal business hours to such of its books, records, accounts, and other sources of information, and its facilities as may be pertinent to ascertain compliance with [DHS Title VI antidiscrimination regulations].").).

### III. RECOMMENDATIONS, REFERRALS, AND REMEDIES

On a case by case basis, responding to the particular situation, if CRCL finds civil rights or civil liberties problems in the course of an investigation, CRCL will provide recommendations, and may refer the investigation to other government bodies with additional oversight authority. Recommendations may encompass:

- Increased officer training and/or oversight on civil rights and civil liberties issues.

- Identification of law enforcement officers who may require disciplinary investigation.

- Referral of matters to state or local authorities, such as state attorneys general or police oversight bodies.

- Referral of significant matters to the U.S. Department of Justice, Civil Rights Division for possible criminal investigation under 18 U.S.C. § 242 or other authorities, or civil litigation under 42 U.S.C. § 14141 or other authorities.

- Prospective inquiry, scrutiny, and/or requested reporting by the agency, which may require the collection of additional information on police conduct, including individualized data on individuals stopped or arrested by the agency.

- Changes to ICE's administration of the Secure Communities program for the individual jurisdiction, if appropriate.

- Improvements to the oversight of the Secure Communities program.

- Restrictions or cancellation of DHS grants to the agency pursuant to the DHS Title VI regulations, if appropriate.