# EXHIBIT 7



Protecting the Homeland

# ICE Response to the Task Force on Secure Communities Findings and Recommendations

## ICE Office of the Director

**April 27, 2012**



U.S. Immigration
and Customs
Enforcement



U.S. Immigration
and Customs
Enforcement

April 27, 2012

On behalf of the Department of Homeland Security (DHS), I would like to commend the Homeland Security Advisory Council (HSAC) and the Task Force on Secure Communities for their diligent work in preparing the Secure Communities Task Force Report.

As part of our efforts to ensure that our immigration enforcement resources are focused on high priority cases, Immigration and Customs Enforcement (ICE) has implemented policies and processes that ensure that those enforcing immigration laws make appropriate use of the discretion they already have in deciding the types of individuals prioritized for removal from the country. ICE prioritizes for removal individuals who have been convicted of a criminal offense, pose a threat to public safety, have repeatedly violated our immigration laws, or have recently entered the United States. Due in significant part to Secure Communities, the composition of the individuals that ICE removes is in line with these priorities. In fiscal year 2011, nearly 55 percent of the people removed by ICE's Office of Enforcement and Removal Operations were convicted of felonies or misdemeanors — an 89 percent increase in the removal of criminals since fiscal year 2008. Ninety percent of all ICE's removals fell into one of ICE's priority categories.

Though we still have work to do, this progress is a testament to the hard work and dedication of thousands of ICE agents, officers, and attorneys around the country. Their hard work has been enhanced by the efforts of the HSAC and Task Force, which was formed to help ICE address the confusion about Secure Communities' scope and operation caused, in part, by some ICE statements. ICE has already begun to implement changes in response to the findings and recommendations included in the HSAC report. I look forward to working with the HSAC to continue to strengthen Secure Communities.

John Morton
Director

- 1 -

**Executive Summary**

The Task Force on Secure Communities is a subcommittee of the HSAC and was created in June 2011 at the request of the Secretary of Homeland Security.  The HSAC, which is composed of leaders from state and local government, first responder agencies, the private sector, and academia, provides advice and recommendations to the Secretary on matters related to homeland security.  In light, in part, of the confusion about how Secure Communities works and who is required to participate that had been created by certain ICE statements, the Task Force was asked to consider how ICE may improve Secure Communities, including how to address some of the concerns that "relate to [its] impact on community policing and the possibility of racial profiling,"[1] and "how to best focus on individuals who pose a true public safety or national security threat."[2]

In November 2011, the HSAC endorsed and released the Task Force's Findings and Recommendations to ICE.   Both the findings and recommendations are organized into the following categories:

I.   Misunderstandings Regarding the Secure Communities and the Role of Local Law Enforcement Agencies
II.   Perceived Inconsistencies between Secure Communities' Stated Goals and Outcomes
III.   Minor Traffic Offenses and Misdemeanors
IV.   Unintended Consequences of Secure Communities on Community Policing and Community Impact
V.   The Question of Whether to Suspend Secure Communities

ICE has conducted a detailed review of the Task Force Report and has made some key improvements based on the recommendations.  Together with the DHS Office for Civil Rights and Civil Liberties (CRCL), ICE has created new briefings for state and local law enforcement on issues related to the proper use of Secure Communities and discussing important civil rights issues.  In addition, ICE launched a comprehensive training program on the appropriate use of the June 17, 2011 Prosecutorial Discretion Memorandum, which is applicable to individuals identified through any enforcement program, including Secure Communities. As of January 2012, all Enforcement and Removal Operations (ERO) management and ICE attorneys nationwide have completed this scenario-based prosecutorial discretion training.

Furthermore, at the direction of the Secretary, ICE developed and released a new policy on the exercise of prosecutorial discretion specifically to protect victims and witnesses of crime, including domestic violence, and individuals involved in non-frivolous efforts related to the protection of their civil rights and liberties. This new policy, articulated in a separate memorandum released on June 17, 2011, aims to ensure that individuals are not deterred from reporting crimes or from pursuing actions to protect their civil rights.  This memorandum has

---

[1] Homeland Security Advisory Council, Task Force on Secure Communities: Tasking (attached as Appendix A to this report).
[2] From the ICE website (Sept. 9, 2011), http://www.ice.gov/secure_communities, click on "What's New."

been included in the comprehensive training for ERO management and ICE attorneys.  And ICE has created a new national hotline for individuals who become subject to an ICE detainer to call if they believe they were identified as a result of being a crime victim, or if they are U.S. citizens

ICE is always looking to improve how we exercise our enforcement operations, and this report outlines the steps the agency has taken to respond to the HSAC's recommendations.  The Department looks forward to a continued relationship with the HSAC.

## Overall Recommendations

***Recommendation 1: ICE must clarify the goals and objectives of the Secure Communities program, as well as the parameters and functioning of the program, and accurately relay this information to participating jurisdictions, future participating jurisdictions, and the communities they serve. Regardless of whether ICE has legal authority to operate Secure Communities without local agreement, ICE must work to develop good working relationships with states, cities, and communities.***

ICE agrees with this recommendation and has recently updated the ICE.gov Secure Communities webpage at http://www.ice.gov/secure_communities/ to provide additional transparency and increased information sharing. These updates include information on how Secure Communities works, frequently asked questions, new ICE policies, the Secure Communities complaint protocol, and briefing materials for state and local law enforcement agencies (LEAs).

ICE has also expanded outreach efforts with key stakeholders at the national, state and local levels, involving both government offices and community groups. During calendar year 2011, ICE conducted more than 730 in-person or telephonic meetings and presentations regarding Secure Communities with various LEAs, the general public, congressional representatives, immigration advocates, and foreign embassy representatives. ICE officials also attended several official government meetings and public town halls. In addition, ICE officials regularly participate and present on Secure Communities and prosecutorial discretion and related topics at Community Engagement Roundtables across the country hosted by the DHS Office for Civil Rights and Civil Liberties. These meetings served as an opportunity to clarify the goals and objectives of Secure Communities and explain the responsibilities of all participants involved, and also provided an avenue for ICE officials to hear and address community concerns about Secure Communities. In addition, in October 2011, Secretary Napolitano and Director Morton spoke with state and local LEAs at the International Association of Chiefs of Police (IACP) Conference about ICE's enforcement priorities and efforts, including issues related to Secure Communities.

As Secure Communities activations continue, ICE is providing briefings to LEAs in states that are capable of receiving information about identifications that result from processing fingerprints through the IDENT database. In states that are not capable of receiving this information, briefings are conducted on an as needed basis.[3] Additionally, ICE continues to provide briefings upon request in states that have already been activated.

Unfortunately, ICE's initial public statements often caused confusion about how Secure Communities works and who is required to participate. These statements created a perception that individual jurisdictions had to agree before Secure Communities could be deployed. ICE has taken steps to clarify that confusion surrounding whether a memorandum of agreement (MOA) is

---

[3] Identifications that result from processing fingerprints through the IDENT database produce a set of information about the identified individual that is also made available electronically to state LEAs, if they wish to receive this information. However, not all states have systems in place that allow them to receive this information electronically from DHS.

required for Secure Communities to operate in a state or local jurisdiction.  Because ICE determined that an MOA is not required, ICE terminated all existing MOAs in 2011.  This determination is based on a 2002 congressional mandate for federal LEAs to share information that is relevant to determine the admissibility or deportability of an alien.  See 8 U.S.C. § 1722(a)(2).  In August 2011, ICE sent letters to states that had existing Secure Communities MOAs to explain the determination that MOAs were not necessary to operate Secure Communities.  The letter informed states that, "ICE has determined that an MOA is not required to activate or operate Secure Communities for any jurisdictions.  Once a state or local LEA voluntarily submits fingerprint data to the federal government, no agreement with the state is legally necessary for one part of the federal government to share it with another part."

***Recommendation 2: ICE must improve the transparency of the program.***

ICE agrees with this recommendation and has ensured that information regarding all aspects of Secure Communities is available online at the ICE.gov Secure Communities webpage (http://www.ice.gov/secure_communities/) and the ICE Freedom of Information Act (FOIA) webpage (http://www.ice.gov/foia/library/).  This includes statistics, frequently asked questions, new developments to Secure Communities, an activated jurisdiction list, CRCL processes related to training and monitoring, and other information.

***Recommendation 3: There is broad consensus in the nation that persons convicted of serious crimes who are in the United States illegally should be subject to deportation. ICE must build on that consensus by implementing systematic mechanisms to ensure that Secure Communities adheres to its stated enforcement objective of prioritizing those who pose a risk to public safety or national security.***

ICE agrees that persons convicted of serious crimes who are in the United States illegally should be deported and that Secure Communities should first prioritize those individuals who pose a risk to public safety and national security.  ICE has set clear civil enforcement priorities, which apply to all ICE enforcement activities including Secure Communities.  These priorities are spelled out in the March 2, 2011 memorandum from Director Morton titled "Civil Immigration Enforcement:  Priorities for the Apprehension, Detention, and Removal of Aliens" (hereafter, "Civil Enforcement Priorities memo").  ICE's highest priority is aliens who pose a danger to national security or a risk to public safety, including aliens convicted of crimes, with particular emphasis on violent criminals, felons, and repeat offenders.  Where resources permit, ICE also prioritizes recent illegal entrants, individuals who have repeatedly violated immigration laws, and aliens who are fugitives.  Through fiscal year 2011, 94 percent of all removals identified through Secure Communities fell within these stated priorities. Statistics on individuals identified and removed through Secure Communities can be found at http://www.ice.gov/doclib/foia/sc-stats/nationwide_interoperability_stats-fy2011-to-date.pdf.

As referenced in the HSAC Task Force on Secure Communities Report, Director Morton issued two memos on June 17, 2011 relating to the exercise of prosecutorial discretion.  The first memo, "Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens," provides guidance to ICE law enforcement personnel and attorneys regarding their authority to exercise

discretion when appropriate.  This authority is designed to help ICE better focus its limited resources on identifying and removing criminal aliens, those that otherwise put public safety at risk, egregious immigration law violators, and recent border crossers.  The second memo, "Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs," directs the exercise of prosecutorial discretion to ensure that victims of and witnesses to crimes and individuals involved in non-frivolous efforts related to the protection of their civil rights and liberties are properly protected from removal.

In October 2011, ICE announced the agency's fiscal year 2011 year-end removal numbers, and 90 percent of all ICE removals fell into one of ICE's priority areas for enforcement.[4]  Of the total removals, nearly 55 percent were convicted of felonies or misdemeanors — an 89 percent increase in the number of criminals removed, compared to fiscal year 2008.  These trends underscore the administration's focus on removing individuals from the country that fall into priority areas for enforcement.

***Recommendation 4: ICE should clarify that civil immigration law violators and individuals who are convicted of or charged with misdemeanors or other minor offenses are not top enforcement priorities unless there are other indicia that they pose a serious risk to public safety or national security.***

ICE agrees that felons should be a higher priority than misdemeanants and civil immigration law violators, although certain serious misdemeanants and egregious civil immigration law violators are priorities as well.  The Civil Enforcement Priorities memorandum states that ICE's top enforcement priority includes aliens convicted of crimes, with higher priority given to individuals convicted of more serious crimes.  The memorandum also states that some misdemeanors are relatively minor and do not warrant the same degree of focus as others, and that ICE agents and officers should exercise particular discretion when dealing with minor traffic offenses such as driving without a license.

The memo, which has been continually reaffirmed in subsequent guidance documents and policy memos explains that for purposes of prioritizing the removal of aliens convicted of crimes, ICE personnel should prioritize individuals in the following order:

- Level 1 offenders: aliens convicted of "aggravated felonies," as defined in § 101(a)(43) of the Immigration and Nationality Act,[5] or two or more crimes each punishable by more than one year, commonly referred to as "felonies";
- Level 2 offenders: aliens convicted of any felony or three or more crimes each punishable

---

[4] The remaining removals could not be statistically tied to one of ICE's civil enforcement priorities. These removals include aliens who had entered the United States without inspection, overstayed a visa, or violated the terms of a visa. These removals could also include ICE priority cases that could not be statistically recorded as such at the time of the removal, such as aliens with criminal convictions that were not available in law enforcement records systems at the time of the removal; aliens engaged in or suspected of terrorism or espionage; aliens subject to outstanding criminal warrants; or aliens who obtained admission or status by visa, identification, or immigration benefit fraud.
[5] The Civil Enforcement Priorities memorandum states that "[a]s the definition of "aggravated felony" includes serious, violent offenses and less serious, non-violent offenses, agents, officers, and attorneys should focus particular attention on the most serious of the aggravated felonies when prioritizing among level one offenses."

by less than one year, commonly referred to as "misdemeanors"; and

- Level 3 offenders: aliens convicted of crimes punishable by less than one year.

The memorandum also explains that individuals who are not criminals but who are repeat border crossers, recently unlawful entrants, or fugitives from the immigration court system are also priorities for enforcement.  As of January 2012, all ERO management and ICE attorneys nationwide have completed scenario-based training on the priorities and prosecutorial discretion.

In addition, ICE has made Secure Communities data more transparent by placing monthly statistics regarding ICE's compliance with the aforementioned Civil Immigration Enforcement Priorities, including updates on criminal alien removals, on the public ICE FOIA website at www.ice.gov/foia/library.

***Recommendation 5: DHS must exercise its prosecutorial discretion, in all its immigration enforcement endeavors, in line with stated enforcement priorities, and take systematic steps to train and monitor field officers and attorneys as they implement Departmental policies on prosecutorial discretion.***

ICE agrees with this recommendation. On November 17, 2011 ICE launched a comprehensive training program on the appropriate use of the June 17, 2011 Prosecutorial Discretion Memorandum.  This program consists of scenario-based training that emphasizes how the prosecutorial discretion memorandums should be utilized in order to focus immigration enforcement resources on ICE priorities.  This program builds on training that has already occurred since the June 2011 memorandums were issued, and aids ICE's efforts to ensure consistency in our procedures for handling individuals arrested and/or detained by ICE. As of January 2012, all ERO enforcement management and ICE attorneys have received this training.

The training has been reinforced by senior Departmental leadership during sessions with the field leadership at ICE.  During the 2011 IACP Conference, Secretary Napolitano and Director Morton met with supervisory ICE officers and attorneys to discuss the agency's enforcement priorities and the importance of these initiatives.  ICE Director Morton, along with other members of ICE's senior leadership team, traveled around the country to discuss the importance of consistent application of prosecutorial discretion.  Over the past several months, Director Morton and his senior leadership have traveled to Los Angeles, Chicago, San Francisco, San Diego, Miami, New York, and Newark to personally instruct enforcement officers and attorneys on the appropriate use of this policy.

During the remainder of fiscal year 2012, Director Morton and other members of the ICE senior leadership will travel to other jurisdictions to conduct additional training.

ICE leadership monitors the implementation of the enforcement priorities and prosecutorial discretion to ensure that these agency policies are being appropriately applied in line with the training received by ICE personnel.  It is important to note the June 2011 prosecutorial discretion memoranda which are the focus of the training, as well as other enforcement policies, apply not just to Secure Communities, but to all of ICE's programs.  For instance, in order to further ensure

these policies are being appropriately applied, ICE attorneys, with the assistance of other DHS attorneys, are currently conducting a comprehensive review of the approximately 300,000 cases pending before the Executive Office of Immigration Review and all incoming cases to determine whether these cases conform to the policies detailed in the Civil Enforcement Priorities Memorandum and the June 2011 Prosecutorial Discretion Memoranda.

**Recommendation 6: DHS must strengthen accountability mechanisms, including remedies for and prevention of civil rights and civil liberties violations.**

ICE agrees with this recommendation and has partnered with CRCL in a number of initiatives:

First, CRCL and ICE are creating a series of video briefings designed primarily for use by front line state and local LEA personnel during daily muster/roll call.  All training videos and related materials will be made available online at http://www.ice.gov/secure_communities/crcl.htm.

This program will provide information to state and local law enforcement about the civil rights and civil liberties issues that may arise when ICE uses federal information sharing capability through Secure Communities in their jurisdictions. This will increase the transparency of DHS's active commitment to protecting the civil rights and civil liberties of all persons affected by DHS activities and programs.

The briefing materials will include a series of short downloadable videos, discussion guides with references to web-based resources for additional information (when applicable), and job aids.  In June 2011, ICE and CRCL released the first training video, which provides a broad overview of Secure Communities for law enforcement, emphasizes that Secure Communities does not provide immigration enforcement authority to state and local LEAs, and explains that law enforcement attention or action should not be based on race, ethnicity, immigration status, or inability to speak English. ICE and CRCL will over the next two months and continuing throughout 2012 release additional briefings that will build on the foundational Secure Communities module.  The next two videos, to be released in April 2012, will be "How to Respond to an ICE Detainer" and "Consular Notification: Your Role in Detaining Foreign Nationals."

Second, to investigate allegations of civil rights violations related to Secure Communities, CRCL has a process whereby individuals or organizations who believe civil rights violations connected to Secure Communities have occurred can file a complaint with CRCL. Additionally, ICE will refer relevant complaints it receives directly or through the Joint Intake Center to CRCL to lead the investigation.  CRCL's general civil rights complaint process is designed to address allegations of civil rights or civil liberties violations by employees of the Department of Homeland Security.  Accordingly, an additional specific complaint protocol was released to spell out how CRCL, with assistance and cooperation from ICE, can also investigate complaints connected to Secure Communities – including those alleging race or ethnicity discrimination by jurisdictions in which Secure Communities has been deployed.  DHS will take steps to ensure that bias or other abuses, when identified, do not affect immigration enforcement.  Information on this protocol can be located online at http://www.ice.gov/doclib/secure-

communities/pdf/complaintprotocol.pdf.  CRCL has received complaints related to Secure Communities, and CRCL is currently investigating these complaints.

Third, ICE has also revised the immigration detainer form to request that jails and prisons provide a copy to any person subject to a detainer.  The revised form includes information in six languages on how to alert ICE to civil rights problems and file a complaint.

Fourth, in order to identify jurisdictions that may be making improper arrests that could result in identification of aliens through Secure Communities, ICE and CRCL have retained a leading criminologist/statistician who is examining data for each jurisdiction where Secure Communities is activated, comparing data for aliens identified by the program to relevant arrest-rate data, and identifying any indications of racial profiling (A description of the method being used is also available on the ICE.gov site at http://www.ice.gov/doclib/secure-communities/pdf/statisticalmonitoring.pdf).  Statistical outliers will be subject to an in-depth analysis, and DHS and ICE will take appropriate steps to resolve any issues.  This analysis will take place four times per year to ensure consistent monitoring, and the assessments will be shared quarterly with the Department of Justice (DOJ). The data review process initiated with data from the third quarter of fiscal year  2011 (April 1-June 30, 2011), and is continuing on a rolling basis, so that outliers identified in one quarter are subject to in-depth analysis as the statistical analysis is conducted on the next quarter's data. CRCL and ICE expect to release further information on the results of the analysis on a periodic basis once investigation of apparent jurisdiction-specific problems is complete.

Finally, as referenced previously, a new policy memo, "Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs," was issued in June 2011 specifically to protect victims of domestic violence and other crimes, and to ensure that these crimes continue to be reported and prosecuted. Individuals who have been arrested and subject to an ICE detainer who believe they were arrested as a result of being a crime victim are encouraged on the detainer form itself to call a new toll-free number answered at ICE's Law Enforcement Support Center (LESC), to enable ICE to take prompt action on aliens against whom enforcement would be inappropriate in light of that policy. The detainer form also requests the local law enforcement agency to notify the ICE LESC if the individual may be the victim of a crime or if the local agency wants this individual to remain in the United States for law enforcement purposes, including acting as a witness.

    I.  **Misunderstandings Regarding the Secure Communities Program and the Role of Local Law Enforcement Agencies.**

**Recommendations**

*1.  Increase transparency and clarify what the Secure Communities program is and how it works.*

ICE agrees with this recommendation. ICE has recently announced the creation of the Public Advocate. This new senior agency position will serve as a point of contact for individuals, including those in immigration proceedings, non-governmental organizations and other

community and advocacy groups, who have concerns, questions, recommendations or other issues they would like to raise. This individual will build constructive relationships with the community and help resolve problems or concerns. ICE has also made this information available on the agency's website at http://www.ice.gov/about/offices/enforcement-removal-operations/publicadvocate/.

The ICE Public Advocate has four primary responsibilities:

- *Assisting* individuals and community stakeholders in addressing and resolving complaints and concerns in accordance with agency policies and operations, particularly concerns related to ICE enforcement actions involving U.S. citizens;
- *Informing* stakeholders on ERO policies, programs and initiatives, and enhance understanding of ERO's mission and core values;
- *Engaging* stakeholders and building partnerships to facilitate communication, foster collaboration and solicit input on immigration enforcement initiatives and operations; and
- *Advising* ICE leadership on stakeholder findings, concerns, recommendations and priorities as they relate to improving immigration enforcement efforts and activities.

ICE also updated the ICE.gov Secure Communities webpage at http://www.ice.gov/secure_communities/ to provide additional transparency and increased information sharing.  These updates include information on how Secure Communities works, frequently asked questions, new ICE policies, the Secure Communities complaint protocol, and training materials for local and state law enforcement agencies.

In addition, the ICE Office of State, Local and Tribal Coordination (OSLTC) continues to accentuate ICE partnerships with state, local and tribal law enforcement partners.  In fiscal year 2011, OSLTC hosted several high level discussions with law enforcement partners on Secure Communities, gang and drug task forces, and child predator investigations to provide clarity and increase transparency on ICE enforcement efforts.  ICE has also engaged a university research group to study the impact of ICE partnerships with state and local law enforcement, and this study will include a review of Secure Communities.

Also, as mentioned previously, ICE regularly participates and presents on Secure Communities and related topics at CRCL's Community Engagement Roundtables across the country; currently there are fourteen roundtables in major metropolitan areas, most held on an ongoing basis quarterly. The roundtables have provided ICE with the opportunity to explain how Secure Communities works at the local level with community and government stakeholders and also to provide clarity about the program and correct misinformation.  More information about the roundtables is available at http://www.dhs.gov/xabout/structure/gc_1273873058706.shtm.

### 2. *Clarify the role of states and local jurisdictions in Secure Communities.*

ICE agrees with this recommendation.  In jurisdictions where Secure Communities has been activated, Secure Communities does not impose any new or additional requirements on state and local law enforcement, nor does it provide immigration enforcement authority to state and local LEAs.  In fact, following the activation of Secure Communities in a jurisdiction, it is important

- 10 -

that LEAs continue to enforce the criminal law in exactly the same manner as they did before Secure Communities was activated.

Under Secure Communities, state and local law enforcement officers are not deputized, do not enforce immigration law, and are not tasked with any additional responsibilities.  In all jurisdictions, except the few in which there is an agreement with the federal government in place under Section 287(g) of the Immigration and Nationality Act, only federal DHS officers and agents make immigration enforcement decisions, and they do so only after a completely independent decision by state and local law enforcement to arrest and book an individual for a criminal violation of state or local law separate and apart from any violations of immigration law.  Prior to activation, ICE provides a notification to state and local LEAs that includes information about Secure Communities.  This notification informs the agency that activation does not in any way change local jurisdiction's existing law enforcement or fingerprinting policies, procedures, or practices.

The information-sharing partnership between DHS and the Federal Bureau of Investigation (FBI) that serves as the cornerstone of Secure Communities fulfills a mandate required by federal law. As a result, Secure Communities is mandatory in that, once the information-sharing capability is activated for a jurisdiction, the fingerprints that state and local law enforcement voluntarily submit to the FBI for criminal justice purposes to be checked against the DOJ's biometric identification system for criminal history records are automatically sent to DHS's biometric system to check against its immigration and law enforcement records.  The United States government has determined that a jurisdiction cannot choose to have the fingerprints it submits to the federal government processed only for criminal history checks.  Further, jurisdictions cannot demand that the identifications that result from DHS's processing of the fingerprints not be shared with local ICE field offices in that jurisdiction.  It is ICE, and not the state or local LEA, that determines what immigration enforcement action, if any, is appropriate.

As referenced earlier, ICE has clarified the roles that state and local law enforcement play with respect to Secure Communities on our website (http://www.ice.gov/secure_communities/crcl.htm) and through training and outreach to key stakeholders at the state, local, and community level.

### 3.  Increase consistency among immigration enforcement programs.

ICE agrees with this recommendation.  ICE will continue to work on ways to improve consistency among enforcement programs within ICE and how individuals are arrested or detained by ICE.  It is important to note that policies such as ICE's civil enforcement priorities, prosecutorial discretion, and protection for victims and witnesses of crimes apply not just to Secure Communities, but to all of ICE's programs.  The comprehensive training ICE has undertaken for its officials on many of these policies will help increase consistency among enforcement programs.  Other components at DHS are also committed to ensuring overall consistency in immigration enforcement programs in line with their unique mission requirements.

### 4.  Work with state and local officials to develop trust in Secure Communities.

ICE agrees with this recommendation.  As referenced previously, ICE has enhanced relationships with state and local officials through training and outreach efforts.  For example, ICE OSLTC coordinated ICE's first nationwide public engagement strategy for field offices.  OSLTC worked with field components to host more than 20 community roundtable events where non-governmental organizations and community stakeholders heard from local ICE leadership.  In addition, OSLTC hosted two national roundtable events in Washington, D.C., with local law enforcement leaders from across the country to solicit their expertise on how to best grow relationships in the field.  The efforts were designed to support ICE in developing a better trust among state and local officials and stakeholders in Secure Communities.  Also, ICE regularly participates and presents on Secure Communities and related topics at CRCL's Community Engagement Roundtables across the country, as discussed above.

ICE will continue to conduct outreach and work with state and local officials during fiscal year 2012.

## II.   Perceived Inconsistencies between Secure Communities on Community Policing and Community Impact.

**Recommendations**

1.  *ICE must reaffirm its enforcement priorities and ensure the Secure Communities adheres to these stated goals.*

ICE agrees with this recommendation.  The Civil Enforcement Priorities memorandum remains binding policy for the agency.  The priorities outlined in the Civil Enforcement Priorities memorandum were reaffirmed in the June 2011 Prosecutorial Discretion Memorandum and a memorandum issued by Principal Legal Advisor Vincent in November 2011, as well the June 2011 memorandum on the treatment of certain victims and witnesses.  Through the application of these memos, including through the case review pilots that were announced in November 2011, ICE is ensuring that all cases are consistent with the agency's enforcement priorities and policies. The letter that Task Force members sent to members of Congress in November on the use of prosecutorial discretion highlights the importance of these memos in ensuring ICE resources are consistently focused on the agency's enforcement priorities.

2.  *"Prosecutorial discretion": DHS must ensure systematic exercise of prosecutorial discretion in all cases by its enforcement personnel.*

ICE agrees that it is important that enforcement personnel consistently apply ICE's civil enforcement priorities and that, as part of these efforts, they exercise prosecutorial discretion on a case-by-case basis where it is appropriate.  To ensure that prosecutorial discretion related to enforcement priorities is consistently applied across all enforcement actions conducted by ICE, several initiatives were recently launched, as pilots, to review all incoming and pending cases to determine whether they meet our enforcement priorities, and thus should be accelerated, or are not an enforcement priority, and thus should be considered for an exercise of prosecutorial discretion.  As reference previously, ICE has also rolled out extensive training on the June 2011

Prosecutorial Discretion memorandums for all ICE attorney's and enforcement management. U.S. Citizenship and Immigration Services (USCIS) also issued a revised policy governing USCIS's issuance of discretionary notices to appear that aligns USCIS's practices in these cases with the priorities articulated by ICE.

### 3. DHS must train and support its own personnel in exercising discretion, and should consult with the field and ICE's own subject matter experts in developing future policies.

ICE agrees with this recommendation.  The June 2011 Prosecutorial Discretion memorandum provides a list of criteria for ICE personnel to use when assessing whether an individual case is appropriate for an exercise of prosecutorial discretion, supplemented by the memorandum regarding victims, witnesses, and plaintiffs.  In November 2011, ICE provided its personnel with additional guidance to aid their efforts to identify cases that are an enforcement priority, and thus should be accelerated, or those that are not an enforcement priority, and thus should be considered for a possible exercise of discretion. These memos were developed with the input of ICE, USCIS, and Customs and Border Protection officials with many years of experience in immigration issues.

ICE will utilize similar outreach and training efforts for future immigration enforcement programs, thus ensuring ICE senior leadership provide the necessary direction, guidance, oversight, and support for implementation of new immigration enforcement programs.

### 4. ICE must improve data collection and be more transparent.

ICE agrees in part with this recommendation.  Regarding data collection, ICE has revised its reporting of statistics related to Secure Communities.  In particular, ICE now provides greater granularity into the categories of aliens that are removed following identification through Secure Communities.  Such reporting further aligns these enforcement actions with the priorities of the agency, and is updated on a monthly basis on the ICE FOIA webpage at http://www.ice.gov/foia/library/.

However, ICE disagrees that a state should monitor enforcement actions related to Secure Communities.  Immigration enforcement is a federal law enforcement function, and Secure Communities stems from a congressionally mandated information sharing partnership between two federal agencies.  Several processes and safeguards have been put in place to address concerns with Secure Communities.  Implementing a panel of state officials to monitor Secure Communities in every state and territory would interfere with the federal government's prerogative to set immigration enforcement policy and would be unduly burdensome on ICE.

### III.   Minor Traffic Offenses and Misdemeanors.

**Recommendations**

### 1. Withhold ICE enforcement action based solely on minor traffic offenses, and consider alterations, including conditional detainers, for other minor offenses.

ICE agrees that enforcement action based solely on a charge for a minor traffic offense is generally not an efficient use of government resources.  For individuals arrested solely for minor traffic offenses, who have not previously been convicted of other crimes and do not fall within any other ICE priority category, ICE will only consider making a detainer operative upon conviction for the minor criminal traffic offense.  Consistent with the HSAC's recommendation, "the category of minor traffic offenses should *not* include driving under the influence, hit-and-run, or reckless driving resulting in injury to persons, or other violations that have the potential of causing serious injury or harm to the public."  To implement this policy, ICE has issued instructions to the field.

It is important to clarify that for individuals convicted of minor criminal traffic offenses, ICE will continue to consider whether prosecutorial discretion is appropriate in individual cases in accordance with Director Morton's March 2, 2011 and June 17, 2011 memorandums.  In assessing whether prosecutorial discretion is appropriate in a case of an individual convicted of a minor traffic offense, ICE personnel will apply the direction of the Civil Enforcement Priorities memo.  That memo, as noted above, explains that because some misdemeanors, like minor traffic offenses such as driving without a license, are relatively minor and do not warrant the same degree of focus as others, ICE personnel should exercise particular discretion when dealing with cases involving such offenses.  ICE agrees with the Task Force's finding that "Secure Communities must be implemented in a way that supports community policing and sustains the trust of all elements of the community in working with local law enforcement agencies."   ICE believes that the policies described above further these important goals and will carefully monitor and evaluate their implementation.

It should be noted that states can choose not to submit to the federal government the fingerprints for individuals arrested for minor offenses.  In states that do not fingerprint for minor offenses (or that fingerprint for state use but do not submit those fingerprints to the FBI), aliens cannot be identified through Secure Communities because they do not become part of the federal information sharing process in the first place.

### 2.   *Continue fingerprint checks.*

ICE agrees with this recommendation.  This approach helps ICE effectuate its priorities, and fulfills a 2002 congressional mandate for federal LEAs to share information that is relevant to determine the admissibility or deportability of an alien. See 8 U.S.C. § 1722(a)(2).

### IV.   Unintended Consequences of Secure Communities on Community Policing and Community Impact.

### 1.   *Secure Communities must be implemented in a way that supports community policing and sustains the trust of all elements of the community in working with local law enforcement agencies.*

ICE agrees with this recommendation and has already taken proactive steps to address this mutual concern with ensuring the success of community policing.  At the direction of Homeland Security Secretary Janet Napolitano, ICE, in consultation with CRCL, developed a new policy to

- 14 -

protect victims and witnesses of crime, including domestic violence, and individuals involved in non-frivolous efforts related to the protection of their civil rights and liberties and to ensure that crimes continue to be reported and prosecuted.

CRCL is developing new roll call briefing videos for state and local LEAs to provide information on how Secure Communities relates to civil rights, including a civil rights overview; key obligations of law enforcement when arresting foreign nationals; detainers; and an alien's right to assistance from his or her country's consulate.  In addition, individuals or organizations who believe a civil rights violation connected to Secure Communities has occurred can file a complaint with CRCL.

In addition, as referenced previously, ICE and CRCL have retained a leading statistician who is examining data for each jurisdiction where Secure Communities is activated, comparing data for aliens identified by the program to relevant arrest-rate data, and identifying any indications of racial profiling.  Statistical outliers in local jurisdictions will be subject to an in-depth analysis, and DHS and ICE will take appropriate steps to resolve any issues.  The effort began with data on Secure Communities identifications in the third quarter of FY 2011. Statistical outliers from that time period have been identified and subjected to further analysis; outliers from the following quarter have also been identified and analysis is ongoing.

ICE believes that community policing is critically important to keeping our local communities safe.  Through these steps, ICE is ensuring that its enforcement programs support community policing.

   ### 2.   *Victims and witnesses to crime and victims of domestic violence must not be subject to immigration enforcement actions.*

ICE agrees with this recommendation.  It is against ICE policy to initiate removal proceedings against an individual known to be the immediate victim or witness to a crime, absent special circumstances.  As previously referenced, the newly developed policy memorandum titled "Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs" (http://www.ice.gov/doclib/secure-communities/pdf/domestic-violence.pdf) directs all ICE officers, special agents, and attorneys to exercise appropriate discretion to ensure that victims of and witnesses to crimes and individuals involved in non-frivolous efforts related to the protection of their civil rights and liberties are not penalized by removal. ICE is also working to develop additional tools that will help ICE identify people who may be victims, witnesses, or members of a vulnerable class so officers can exercise appropriate discretion.

Additionally, DHS offers protection and assistance to victims of trafficking and violence, including individuals who might have been arrested for a crime and subsequently determined to be a victim, not a perpetrator.  ICE works closely with LEAs and prosecutors handling victim related cases and offers protection to victims in those cases. USCIS also offers two types of visas to protect victims of human trafficking and other crimes, such as rape, murder, manslaughter, domestic violence, sexual assault and many more.  T nonimmigrant status (T visa) provides immigration protection to victims of

trafficking, and U nonimmigrant status (U visa) provides immigration protection to crime victims who have suffered substantial mental or physical abuse as a result of the crime.

These policies help ensure that local law enforcement agencies retain the trust of the community in jurisdictions where Secure Communities is deployed.

### 3.  Tailoring the information provided to local police.

ICE does not agree with this recommendation.  Currently, where there is a positive match through Secure Communities, and the state and/or law enforcement agency is technically capable and willing to obtain this information, ICE provides to the LEA a set of certain information about that individual.  This information includes ICE's initial status determination about the individual's alienage and removability as well as biographical information about the individual contained in federal databases.  Tailoring this information on a state-by-basis would involve significant logistical difficulties.  In addition to these logistical difficulties, ICE does not believe it is an appropriate use of our resources to tailor a separate process for providing information to each of the 3,181 jurisdictions in the United States.  However, a state or local jurisdiction may choose not to receive the information about identifications that result from processing fingerprints through DHS databases and are in turn provided to the local ICE field office.  A jurisdiction's decision to not receive information will not impact whether the local ICE field office will or will not take enforcement action based on those results.

### 4.  The complaint process must be meaningful and accessible.

ICE agrees with this recommendation and has taken significant steps to address this issue by assisting CRCL with their investigation of complaints related to Secure Communities. ICE takes allegations of racial profiling and other complaints relating to civil rights and civil liberties violations very seriously.  Under ICE's current process, formal allegations are referred to CRCL. CRCL conducts an investigation of the complaint, and notifies DOJ, which has jurisdiction to investigate serious complaints with merit that violations of civil rights by state and local officers have occurred.  As discussed earlier, the CRCL-ICE complaint process specific to Secure Communities is located online at http://www.ice.gov/doclib/secure-communities/pdf/complaintprotocol.pdf, and information on filing civil rights complaints with CRCL generally is available at http://www.dhs.gov/crcl.  The new detainer form directs subjects of ICE detainers who believe their civil rights have been violated by DHS actions to contact the ICE Joint Intake Center at 1-877-2INTAKE (877-246-8253), or to contact the new hotline ((855) 448-6903) if the individual is a crime victim or U.S. citizen.

ICE fully supports all DOJ and CRCL investigations through actions such as ensuring witnesses and complainants are able to remain in the United States.  ICE will not allow Secure Communities to turn into a conduit for any civil rights abuses. The safeguards developed by ICE and CRCL that are described throughout this report—briefings for local law enforcement, the complaint processes, and data collection and monitoring—

should further deter individual officers or jurisdictions from engaging in racial or ethnic profiling, or other improper policing practices.

### 5. *Remedial measures to prevent abuse.*

ICE agrees with this recommendation.  As referenced previously, ICE and CRCL have created an ongoing quarterly statistical review of Secure Communities in order to identify effectiveness and any indications of potentially improper use.  In addition, ICE has released a new detainer form.  The form requests that a copy be provided to the detainee and provides instructions, in six languages, for the detainee to contact a new national hotline, answered by the ICE Law Enforcement Support Center, for aliens who believe they were identified as crime victims or who are U.S. citizens. That hotline is (855) 448-6903. Aliens who have other civil rights or civil liberties complaints are directed to contact the ICE Joint Intake Center at 1-877-2-INTAKE (1-877-246-8263).

### 6. *ICE should consider establishing, as a pilot initiative in a selected jurisdiction, an independent, multi-disciplinary panel to review specific cases.*

ICE does not agree with this recommendation.  Due to the newly created complaint system and quarterly statistical review of Secure Communities, ICE believes that a panel is not necessary at this time.

**Conclusion**

Secure Communities is a simple and common sense way to carry out ICE's priorities.  It uses an already-existing federal information-sharing partnership between ICE and the FBI that helps to identify criminal aliens and other aliens that meet ICE's enforcement priorities.  Secure Communities has proven to be a central tool in DHS's efforts to focus our limited immigration enforcement resources on high priority individuals, namely criminals or those who otherwise pose a threat to public safety or national security, as well as repeat or egregious immigration law violators and recent border crossers.

Secure Communities has facilitated ICE's ability to identify and remove criminal aliens. Between October 2008 and the end of fiscal year 2011, the number of convicted criminals that ICE removed from the United States increased 89 percent, while the number of other aliens removed dropped by 29 percent.  These trends are due in significant part to the implementation and expansion of Secure Communities.  Through December 31, 2011, cumulative removals of aliens identified through Secure Communities totaled 162,940—70,396 were convicted of felonies or several misdemeanors (criminal offense levels 1 and 2), 49,516 were convicted of one or two misdemeanors (criminal offense level 3), and 43,028 individuals were removed whose law enforcement records did not show a current conviction.  Of that last group, 28,864 were categorized as prior removals or returns, and 4,843 were ICE fugitives (individuals who have absconded after receiving a final order of removal from an immigration court), which are also ICE priorities for removal.  Only 9,321 (under 6 percent) of all removals attributed to Secure Communities involve an individual who entered the country without inspection, were visa violators, or remained in the country without authorization. Nevertheless, there is always room to improve Secure Communities and, in particular, how it is presented and explained to state and local governments, stakeholders, and the public.

The HSAC proposed recommendations to address these concerns with Secure Communities.  ICE has embraced the HSAC recommendations, and in response has made changes to policy as well as to training programs.  Moreover, ICE, working with CRCL, has adopted robust monitoring and complaint processes to ensure that the program continues to operate in light of ICE's priorities.  These changes that ICE adopted address the concerns that the Task Force identified with Secure Communities.

Despite the public debate about Secure Communities, it has proven to be the single best tool at focusing ICE's immigration enforcement resources on individuals who have been convicted of a criminal offense, pose a threat to public safety, have repeatedly violated our immigration laws, or have recently entered the United States.

**Appendix A**

**Homeland Security Advisory Council**
**Task Force on Secure Communities: Tasking Document**

Secure Communities is one of the Department's most important tools to ensure that the federal government's limited immigration enforcement resources are used in the most effective way possible to improve public safety.

As a matter of policy, Secure Communities should **advance** ICE priorities, **namely protecting public safety and national security, border security, and the integrity of the immigration system.**

Concerns have been expressed regarding the identification and removal, **through Secure Communities**, of aliens charged with, but not convicted of, minor traffic offenses who have no other criminal history or history of immigration violations.  Some of these concerns relate to the impact on community policing and the possibility of racial profiling.  One possible avenue for potentially addressing some of these concerns could be a policy that would await conviction prior to removal for those charged with low level traffic offenses (excluding driving under the influence, hit and run, and other traffic offenses affecting public safety) or other minor misdemeanor offenses who have no outstanding orders of removal or history of immigration violations.

The Task Force on Secure Communities (TFSC) will review the extent to which those concerns are borne out in the field and provide substantive, actionable recommendations to the Homeland Security Advisory Council (HSAC) on how substantive contours of Secure Communities policy could be formulated to address valid concerns, including recommendations on policy changes and the best procedural way to implement any policy changes.

Specifically, the Task Force will address the following questions:
- o   How should Secure Communities address those arrested for minor traffic offenses?
- o   What traffic offenses should be considered minor?
- o   Does the identification of minor traffic offenders through Secure Communities influence community policing or the reporting of crimes?
- o   Are there other misdemeanor offenses such as loitering that should be treated as a minor offense?
- o   How should the implementation of **any** policy with regard to minor traffic offenders or other minor criminal offenders be announced to and coordinated with state and local law enforcement agencies?