# EXHIBIT 8


# Secure Communities: Statistical Monitoring
(last revised Nov. 16, 2011)

Through the Secure Communities program, after fingerprints for individuals booked into jails by state and local police are received by the FBI for checks against various criminal justice databases, those fingerprints are then checked against Department of Homeland Security (DHS) databases, revealing if a fingerprinted arrestee may be a removable alien. The data and information available to DHS can offer a window into policing practices that may help identify potential civil rights issues in state or local law enforcement agencies where Secure Communities is activated.

DHS is committed to ensuring the Secure Communities program incorporates robust civil rights oversight. To that end, the DHS Office for Civil Rights and Civil Liberties (CRCL) and U.S. Immigration and Customs Enforcement (ICE) have developed a three-part process for identifying jurisdictions in which further analysis and oversight measures may be warranted:

### 1. Statistical monitoring

Each quarter, ICE and CRCL, with the assistance of an outside expert statistician, calculate statistics based on fingerprint submissions, alien identifications, and underlying demographic and crime data to identify jurisdictions whose arrest patterns appear unusual or anomalous. A statistical anomaly does *not* conclusively determine that the jurisdiction is making inappropriate or unlawful arrests. Rather, the statistics aim to identify a set of jurisdictions for additional analysis.

The technical details are available here, but the statistics are fairly straightforward. *First*, for each county where Secure Communities has been activated, we compare the percentage of all alien arrestee fingerprints that match an immigration database record to the percentage of that county's population that (based on Census Bureau data) was born abroad. *Second*, we compare the number of arrested aliens with immigration records to the overall crime data for the county (as surveyed by the FBI) multiplied by the percentage of the county's population that was born abroad. And *third*, we compare the incidence of less-serious criminal arrests among the identified alien group with the same incidence in the overall crime data. For each of these metrics, a particularly high score *could* result from unusual or skewed police attention to crimes committed by aliens, or it could instead result from a variety of other circumstances. Using these calculations, CRCL produces a set of approximately two dozen of the highest-ranking jurisdictions for further analysis, each quarter.

### 2. Statistical analysis

Having identified jurisdictions to examine, we can then use more resource-intensive and individualized analytic techniques. In particular, we can review data such as: variation in arrest statistics over time; additional demographic information; more detailed general arrest and crime information; seasonal variation in crime patterns; comparison to adjacent jurisdictions; changes in state law, law enforcement policy, or data systems that could produce unusual statistics; and other data that may have been reported. In addition to purely statistical research, this step can involve contact with the ICE field office to better understand the characteristics of the jurisdictions.

### 3. Direct investigation

Where statistical analysis leaves open questions, or where ICE or CRCL have received a complaint meriting investigation, we will conduct direct, non-statistical inquiries. Such an investigation may involve more traditional civil rights investigation tools, such as interviews with complainants, law enforcement, and local ICE personnel; review of documents requested from the agency or agencies involved; site visits; and related methods. DHS will also notify the Department of Justice of these inquiries at appropriate points.

We anticipate that law enforcement agencies will voluntarily cooperate with our investigations. If necessary, additional tools exist to encourage cooperation, including adjustments to Secure Communities protocols for the relevant jurisdiction and using DHS's Title VI authority if appropriate.