UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HEARTLAND ALLIANCE FOR HUMAN NEEDS & HUMAN RIGHTS d/b/a NATIONAL IMMIGRANT JUSTICE CENTER<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY *et al.*<br><br>    Defendants. | No. 1:16-cv-00211-RMC |

**PLAINTIFF'S STATEMENT OF MATERIAL
FACTS NOT IN GENUINE DISPUTE**

In support of its Cross-Motion for Partial Summary Judgment, Plaintiff states the following material facts not in dispute:

1. Plaintiff's FOIA request to the United States Department of Homeland Security's ("DHS") Office of Civil Rights and Civil Liberties ("CRCL") dated March 14, 2014 requested, *inter alia*, "all reports produced related to the Secure Communities Statistical Monitoring, including all draft reports and reports produced by contracted statistician(s)." *See* Declaration of Seth A. Watkins in Support of Plaintiff's Motion for Partial Summary Judgment (hereinafter, "Watkins Decl."), Exhibit 1 at 1.

2. DHS first indicated to Plaintiff on January 12, 2017, in a *Vaughn* index, that "[n]o final report related to Secure Communities statistical monitoring was created, approved, or executed by the [Office for Civil Rights and Civil Liberties (CRCL)] Officer or submitted to the Secretary of DHS or member of senior DHS leadership." *See* Watkins Decl., Exhibit 2 at 1.

3. Prior to DHS's January 12, 2017 *Vaughn* index in this action, DHS had not acknowledged in a publicly available record that no final reports existed related to Secure Communities statistical monitoring.

4. DHS has provided Plaintiff with a total of five *Vaughn* indexes covering withheld drafts of Secure Communities statistical monitoring report documents:

- an index served on March 31, 2017 covering two (2) draft reports, over a time frame that at least includes *May 13, 2011*, totaling 8 pages;
- an index served on January 12, 2017 covering twenty-eight (28) iterations of a draft report, over a time frame that at least includes *May 18, 2011 through July 18, 2011*, totaling 1190 pages;
- an index also served on March 31, 2017 covering seven (7) iterations of a draft report, over a time frame that at least includes *July 2012*, totaling 123 pages;
- an index also served on March 31, 2017 covering six (6) draft "comment matrices," over a time frame that at least includes *June-July 2013*, totaling 65 pages, which were completely redacted other than the headings of the tables that formed the comment matrices; and
- an index also served on March 31, 2017 covering forty (40) iterations of a draft report, over a time frame that at least includes *November 2012 through August 2013*, totaling 1127 pages.

*See* ECF Nos. 25-1, 29-1, 29-2, 29-3, & 29-4. Thus, a total of eighty-three (83) draft report documents have been withheld, all under the deliberative process privilege, 5 U.S.C. § 552(b)(5). *Id.*

5. Plaintiff's FOIA request to DHS's CRCL dated November 4, 2016 requested, *inter alia*, "all reports produced related to [Priority Enforcement Program ("PEP")] statistical monitoring, including all draft reports, all reports produced by contracted statistician(s), and all statistical and data monitoring reports." *See* Watkins Decl., Exhibit 3 at 2.

6. DHS first indicated to Plaintiff on January 12, 2017, in a *Vaughn* index, that "[n]o reports, in draft or final form, were created relating to PEP statistical monitoring." *See* Watkins Decl., Exhibit 2 at 1.

7. Prior to DHS's January 12, 2017 *Vaughn* index in this action, DHS had not acknowledged in a publicly available record that no final reports existed related to PEP statistical monitoring.

8. Secure Communities was an immigration enforcement program administered by U.S. Immigration and Customs Enforcement ("ICE") from 2008 to 2014; it was replaced by the Priority Enforcement Program ("PEP") in 2015. *See* Watkins Decl., Exhibit 4, available at https://www.ice.gov/secure-communities.

9. The web site of ICE discloses:

> When state and local law enforcement officers arrest and book someone into custody for a violation of a criminal offense, they generally fingerprint the person. After fingerprints are taken, the state and local authorities submit the fingerprints to the FBI. The FBI takes these fingerprints and runs them through its database of criminal records and sends the state and local authorities a record of the person's criminal history.

*See* Watkins Decl., Exhibit 5 at 4, available at https://www.ice.gov/secure-communities#tab1.

10. The web site of ICE further discloses:

> Under Secure Communities, DHS receive[d] these fingerprints from the FBI, so that ICE [could] determine if that person [was] also subject to removal (deportation). . . .
>
> If the person ha[d] been previously encountered and fingerprinted by an immigration official and there [was] a digitized record, then the immigration database [would] register a 'match.' ICE then review[ed] other databases to determine whether the person [was] here illegally or [was] otherwise removable.
>
> In cases where the person appear[ed] from these checks to be removable, ICE may [have] issue[d] a detainer on the person, requesting that the state or local jail facility hold the individual no more than an extra 48 hours (excluding weekends and holidays) to allow for an interview of the person. Following the interview, ICE decide[d] whether to seek the person's removal.
>
> In making these decisions, ICE consider[ed] a number of factors, including the person's criminal history, immigration history (such

>as whether the person was previously deported or ha[d] an outstanding removal order from an immigration judge), family ties, duration of stay in the U.S., significant medical issues, and other circumstances.

*Id.*

11.     A memorandum to all ICE and CRCL Personnel from Margo Schlanger, Officer for Civil Rights and Civil Liberties, DHS and Gary Mead, Executive Associate Director, ICE, concerning "Secure Communities Complaints Involving State or Local Law Enforcement Agencies," dated June 14, 2011, set out how the government would "address civil rights complaints" including "statistical anomalies ('yellow flags') recognized through standing quarterly reviews of Secure Communities data." *See* Watkins Decl., Exhibit 6 at 1-2.

12.     A Task Force on Secure Communities also was created in June 2011 at the request of the Secretary of Homeland Security and was asked to consider how ICE might improve Secure Communities. *See* Watkins Decl., Exhibit 7 at 2, ICE Office of the Director, PROTECTING THE HOMELAND: ICE RESPONSE TO THE TASK FORCE ON SECURE COMMUNITIES FINDINGS AND RECOMMENDATIONS (Apr. 27, 2012) (hereinafter, "ICE Response to the Task Force"), available at http://www.dhs.gov/xlibrary/assets/hsac/ice-response-to-task-force-on-secure-communities.pdf. Specifically, the Task Force was asked how to address concerns that Secure Communities impacted community policing and involved the possibility of racial profiling. *Id.* The Task Force also was asked to address "how to best focus on individuals who pose a true public safety or national security threat." *Id.*

13.     The ICE Response to the Task Force disclosed that the Task Force recommended that "DHS must strengthen accountability mechanisms, including remedies for and prevention of civil rights and civil liberties violations." *Id.* at 8.

14. The ICE Response to the Task Force disclosed:

> . . . [I]n order to identify jurisdictions that may be making improper arrests that could result in identification of aliens through Secure Communities, ICE and CRCL have retained a leading criminologist/statistician who is examining data for each jurisdiction where Secure Communities is activated, comparing data for aliens identified by the program to relevant arrest-rate data, and identifying any indications of racial profiling (A description of the method being used is also available on the ICE.gov site at http://www.ice.gov/doclib/securecommunities/pdf/ statisticalmonitoring.pdf). Statistical outliers will be subject to an in-depth analysis, and DHS and ICE will take appropriate steps to resolve any issues. This analysis will take place four times per year to ensure consistent monitoring, and the assessments will be shared quarterly with the Department of Justice (DOJ). The data review process initiated with data from the third quarter of fiscal year 2011 (April 1-June 30, 2011), and is continuing on a rolling basis, so that outliers identified in one quarter are subject to in-depth analysis as the statistical analysis is conducted on the next quarter's data. CRCL and ICE expect to release further information on the results of the analysis on a periodic basis once investigation of apparent jurisdiction-specific problems is complete.

*Id.* at 9.

15. With respect to the statistical monitoring, DHS stated in a document entitled

SECURE COMMUNITIES: STATISTICAL MONITORING:

> Each quarter, ICE and CRCL, with the assistance of an outside expert statistician, calculate statistics based on fingerprint submissions, alien identifications, and underlying demographic and crime data to identify jurisdictions whose arrest patterns appear unusual or anomalous. A statistical anomaly does *not* conclusively determine that the jurisdiction is making inappropriate or unlawful arrests. Rather, the statistics aim to identify a set of jurisdictions for additional analysis.
>
> The technical details are available [at this hyperlink], but the statistics are fairly straightforward. *First*, for each county where Secure Communities has been activated, we compare the percentage of all alien arrestee fingerprints that match an immigration database record to the percentage of that county's population that (based on Census Bureau data) was born abroad. *Second*, we compare the number of arrested aliens with immigration records to the overall crime data for the county (as

> surveyed by the FBI) multiplied by the percentage of the county's population that was born abroad. And *third*, we compare the incidence of less-serious criminal arrests among the identified alien group with the same incidence in the overall crime data. For each of these metrics, a particularly high score *could* result from unusual or skewed police attention to crimes committed by aliens, or it could instead result from a variety of other circumstances. Using these calculations, CRCL produces a set of approximately two dozen of the highest-ranking jurisdictions for further analysis, each quarter.

*See* Watkins Decl., Exhibit 8, SECURE COMMUNITIES: STATISTICAL MONITORING, (hereinafter, "DHS Statistical Monitoring Document 1") U.S. Dep't of Homeland Security (Nov. 16, 2011), available at https://www.ice.gov/doclib/secure-communities/pdf/statisticalmonitoring.pdf (indicating a file name "statisticalmonitoring.pdf").

16. DHS also produced a second document entitled SECURE COMMUNITIES: STATISTICAL MONITORING (hereinafter, "DHS Statistical Monitoring Document 2") which also indicates a date of "last revision" of November 16, 2011. *See* Watkins Decl., Exhibit 9, SECURE COMMUNITIES: STATISTICAL MONITORING, Dep't of Homeland Security (Nov. 16, 2011), available at https://web.archive.org/web/20121007101300/http://www.ice.gov/doclib/secure-communities/pdf/sc-statistical-monitoring.pdf (indicating a file name "sc-statistical-monitoring.pdf).

17. The DHS Statistical Monitoring Document 2 was made publicly available.

18. A hyperlink (http://www.ice.gov/doclib/secure-communities/pdf/sc-statistical-monitoring.pdf) to the DHS Statistical Monitoring Document 2 was provided in the DHS Statistical Monitoring Document 1 under the heading "1. Statistical monitoring" at the last of the words "The technical details are available here." *See* Watkins Decl., Exhibit 8. The DHS Statistical Monitoring Document 2 is no longer available at that hyperlink, but is still available on the internet at https://web.archive.org/web/20121007101300/http://www.ice.gov/doclib/

secure-communities/pdf/sc-statistical-monitoring.pdf. *See* Watkins Decl, Exhibit 9. The file name in the aforementioned hyperlink in the DHS Statistical Monitoring Document 2, sc-statistical-monitoring.pdf, is the same as the file name available from the aforementioned web address as part of https://web.archive.org.

19. The DHS Statistical Monitoring Document 2 states that "[i]n June 2011 ICE Director John Morton and DHS Officer for Civil Rights and Civil Liberties Margo Schlanger announced DHS's plan for a quarterly review of Secure Communities-related statistics." *Id.* at 1.

20. The DHS Statistical Monitoring Document 2 states that "[t]he statistical metrics that have been designed for this initiative aim to identify a set of jurisdictions for additional analysis, based on the limited available information." *Id.*

21. The statistical metrics identified in the DHS Statistical Monitoring Document 2 for the monitoring include: (1) a "foreign-born arrestee comparison" which sought to identify "the jurisdictions where aliens appear to constitute a significantly greater fraction of the arrested population than they do of the general population"; (2) a "foreign-born crime comparison" which sought to identify "[p]atterns showing aliens are arrested at a higher rate for minor crimes, relative to their proportion within the population and the underlying crime incidence"; and (3) an "identified alien crime severity comparison" which sought to identify where "enforcement among aliens is particularly concentrated on minor crimes—arrests for which are more often (but not always) discretionary, and therefore the areas in which bias might occur." *Id.* at 2-6.

22. With respect to a "foreign-born arrestee comparison," the DHS Statistical Monitoring Document 2 discloses:

> *Compares IDENT matches as a portion of all fingerprint submissions with foreign-born proportion of population*
>
> Secure Communities' use of IDENT/IAFIS interoperability examines individuals whom IDENT identifies as aliens—"alien

IDENT matches." IDENT records of known U.S. citizens are disregarded by Secure Communities.

The first data metric compares **the fraction of a county's arrestees who are alien [Automated Biometric Identification System (IDENT)] matches to the fraction of the county's population that is foreign-born**, as determined by the [American Community Survey (ACS)]. We then rank jurisdictions by the extent to which the rate of alien IDENT matches exceeds the foreign-born population.

$$\text{Foreign Born Arrestee Comparison} = \frac{\frac{\text{IDENT Matches}}{\text{IAFIS Submissions}}}{\text{\% Foreign Born}}$$

23.     With respect to the "foreign-born arrestee comparison," the DHS Statistical Monitoring Document 2 further discloses the limitations of this metric:

> This metric has four important limitations, the first two of which we are working to address across all jurisdictions, and the last two of which can be taken account of in followup analysis:
>
> 1.      Sometimes individuals who are arrested and booked are fingerprinted more than once at different points in the criminal justice process. The rate at which individuals are fingerprinted multiple times in the process-and accordingly appear more than once in our data set-varies from place to place (although early review indicates that the variation is small), and could affect the ratio of matches to submissions in particular jurisdictions. We are investigating this duplication issue and may in the future adjust the metric to account for variations in duplication rates between counties. (The second metric, described below, is duplication-adjusted, which minimizes the impact of this data imperfection.)
>
> 2.      IDENT does not cover the foreign-born population at a uniform rate across jurisdictions. Persons who have entered without inspection (as by illegally crossing the border between ports of entry), and have no prior encounter with federal immigration agencies, will generally not be in IDENT. Communities where such persons make up a higher percentage of aliens will have a lower IDENT match rate, relative to the total foreign-born population, than will communities where most foreign-born persons, including illegal aliens, entered after inspection (such as by overstaying after expiration of a visa). ICE is working to better understand variation in IDENT coverage of the foreign-born population.

      3.    In some jurisdictions, a substantial percentage of arrests may be individuals who reside outside the jurisdiction. These could include low-population jurisdictions where many arrests involve vehicles on a major thruway, urban jurisdictions where a significant fraction of arrestees live in adjacent jurisdictions but travel back and forth, or other patterns. A significant mismatch between the offender and resident populations could impact the metric, irrespective of particular policing practices, as a result of the comparison to the foreign-born *resident* population of the jurisdiction.

      4.    This metric could be skewed in jurisdictions that experienced a significant recent change in the foreign-born population that was not yet captured by the latest available ACS data.

    24.    With respect to a "foreign-born crime comparison," the DHS Statistical Monitoring Document 2 discloses:

> *Compares alien arrest patterns to underlying crime rates*
>
> Once a fingerprint submission is identified as an alien IDENT match, ICE's Law Enforcement Support Center (LESC) reviews additional databases to determine the individual's criminal history, for purposes of resource prioritization. The LESC flags individuals who have a prior confirmed conviction for an aggravated felony or are known to have just been arrested for an aggravated felony. ("Aggravated felony" is a term of art in immigration law.[FN1]) We utilize the LESC's limited separation of aggravated felonies from other felonies and misdemeanors for the second data metric; those aliens who have no known prior conviction for, or current arrest for, an aggravated felony are designated "LESC L2&3."
>
>> [FN1] *See* 8 U.S.C. § 1101(a)(43) (defining "aggravated felony" to include a wide range of violent and non-violent crimes).
>
> The second data metric compares **the number of IDENT-matched aliens arrested for non-aggravated felonies and misdemeanors (and with no prior conviction for an aggravated felony) to the jurisdiction's overall rate of such arrests, adjusted for the percentage of the jurisdiction's population that is foreign-born**. Patterns showing aliens are arrested at a high rate for minor crimes, relative to their proportion within the

population and the underlying crime incidence may warrant further analysis.

$$\text{Foreign Born Crime Comparison} = \frac{\text{LESC L2\&L3}}{\frac{1}{4}\text{UCR NonAgg.Fel.Arrests} \times \text{\% Foreign Born}}$$

25. With respect to a "foreign-born crime comparison," the DHS Statistical Monitoring Document 2 further discloses the limitations of this metric:

> This metric has five important limitations; again, we are taking each of these into account:
>
> 1. Although for this metric, we attempt to control for the duplication problem described as limitation (1) in the discussion of the first metric above, that ameliorates but does not eliminate duplication as an issue. Where possible, we reduce the duplication problem for the Foreign Born Crime Comparison by adjusting each jurisdiction's LESC L2&3 number by a duplication multiple (calculated by examining all of the IDENT matches in that jurisdiction in a nine-month period to identify multiple submissions[FN2]). Most jurisdictions have relatively similar duplication rates, so this adjustment materially affects the relative order of only a small fraction of jurisdictions.
>
>> [FN2] The nine-month window for determining when multiple fingerprint submissions are likely to have arisen from a single arrest rather than multiple arrests of the same individual was chosen as a reasonable assumption regarding the length of an arrest cycle. While a different time frame might yield somewhat different duplication results, the range of values is sufficiently small that we believe that the choice of de-duplication interval is not a significant factor in the rankings on this metric.
>
> The duplication rate cannot be calculated for some jurisdictions for technical reasons related to the format in which they submit fingerprints to FBI ("National Fingerprint File" (NFF) states). For those jurisdictions, we adjust by the mean duplication rate from similarly-sized counties.
>
> 2. The mobile-population issue, described as limitation (3) of the first metric above.

> 3. Aligning underlying crime data with the LESC's separation of aggravated felonies from other crimes is imperfect, as "aggravated felony" is not a category used by the UCR. Many offenses tracked by the UCR may or may not qualify as aggravated felonies in particular circumstances, but this metric necessarily makes a categorical distinction among UCR crimes.[FN3]
>
>> [FN3] UCR categories DRGSALE, MURDER, RAPE, AGASSLT, ARSON, BURGLRY, ROBBERY, EMBEZL, and WEAPONS are mapped as aggravated felonies, and all other categories to other crimes.
>
> 4. Not all counties participate in the VCR, and so may not have comparable underlying crime rates for us to review; we use other arrest data, where it is available and comparable to UCR, but some jurisdictions cannot be reviewed with this comparison.
>
> 5. The most significant limitation results from LESC's operational goal of responding to each Secure Communities inquiry within four hours, and the fact that the data the LESC receives directly from IDENT/IAFIS interoperability do not include any information on the crime for which the individual was arrested and fingerprinted. While the LESC attempts to obtain both prior criminal history and information on the instant arrest, its ability to obtain instant-arrest information in its limited window of time is highly constrained. As a result, some alien IDENT matches that result from an arrest for an aggravated felony are not categorized as Level 1 leads by the LESC (though ICE field agents escalate a case's priority once they obtain information on an aggravated felony arrest). And, conversely, some aliens are classified as Level 1 leads by LESC not because of their instant arrest, but because of a known *prior* conviction for an aggravated felony. ICE and the FBI are working on advanced software and data-flow procedures that will eventually enable the LESC to have closer to real-time information on the severity of instant arrests, but until that technology is available-in a few years-LESC data is of real but limited value in determining the *kinds* of arrests law enforcement agencies are making. ICE has, however, undertaken a short-term study to better estimate the proportion of aliens categorized as LESC L1 on each applicable basis. When that study is complete, we may be able to improve this metric.

26. With respect to an "identified alien crime severity comparison," the DHS Statistical Monitoring Document 2 discloses:

- 11 -

> *Compares the severity of offenses among IDENT-identified arrested aliens with the severity among the entire population of arrestees*
>
> The third metric compares the relative incidence of lesser crimes as a fraction of all crimes among the general population and the alien population. Like the second metric, the third metric utilizes the LESC's separation of alien IDENT matches with immediate arrests for, or readily available confirmed convictions for, aggravated felonies, from the other alien IDENT matches.
>
> We compare **the ratio of less-serious crimes to all arrests in the IDENT matches to the comparable ratio in general crime data**.

$$\text{Identified Alien Crime Severity Comparison} = \frac{\left(\frac{\text{LESC L2\&L3}}{\text{IDENT Matches}}\right)}{\left(\frac{\text{UCR NonAgg.Fel.Arrests}}{\text{All UCR Arrests}}\right)}$$

27. With respect to an "identified alien crime severity comparison," the DHS Statistical Monitoring Document 2 further discloses the limitations of this metric:

> . . . If a county has a high rank on this metric, it could suggest that enforcement among aliens is particularly concentrated on minor crimes-arrests for which are more often (but not always) discretionary, and therefore the areas in which bias might occur. Again, however, there are many reasons for such a result, and the purpose of this tool is to identify jurisdictions for further analysis.
>
> The formula used for this comparison has the advantage that it should not be affected by duplicate submissions of fingerprints at various points in the criminal justice process. Otherwise, however, it shares the limitations discussed for the second metric. Moreover, because of its sensitivity to small numbers, we only calculate this number for jurisdictions with at least 5 IDENT matches in the quarter. This metric is principally used to rank jurisdictions that have been identified through one of the prior two metrics; a jurisdiction that ranks highly only on this metric is unlikely to be a primary focus for further analysis at this time.

28. The DHS Statistical Monitoring Document 2 states:

> It is important to remember that ranking jurisdictions, which focuses on the differences among them, should compensate for some of the data issues described above. In addition, the monitoring we intend is not akin to an indictment or other

declaration of wrongdoing but rather simply a nomination for additional analysis. To date, ICE and CRCL have been through two quarters of data. We used data from the second quarter of FY 2011 to refine the metrics; the third quarter of FY 2011 allowed the first use of the statistical monitoring methodology. We have begun follow-up steps (explained in section B below).

29. The DHS Statistical Monitoring Document 2 provides tables with sample Secure Communities statistical monitoring data as well as sample calculations using the three Secure Communities monitoring metrics of "foreign-born arrestee comparison," "foreign-born crime comparison," and "identified alien crime severity comparison":

> The data and metrics are contained in a flat spreadsheet with one record per jurisdiction (county or county-equivalent). The sample data below illustrate the fields involved in the monitoring metrics described in this document. (The database also contains additional information on ICE activity.)

**Table 1. Sample data used for Secure Communities quarterly reviews**
*Sample data: These are not real counties.*

| State | County | Population | County Size | % Foreign-born Residents | Est. Agg. Felony Arrests | Est. Lesser Crime Arrests | Duplication Multiplier | Fingerprint Submissions (quarter) | LESC Level 1 (Agg. Felony) Matches (quarter) | LESC Level 2&3 (Other Felony/Misdemeanor) Matches (quarter) |
|---|---|---|---|---|---|---|---|---|---|---|
| XX | Smith | 404,922 | large | 30.07% | 2,316 | 12,409 | 1.310 | 4,524 | 48 | 533 |
| XY | Ng | 332,059 | large | 10.09% | 1,719 | 8,755 | 1.662 | 2,899 | 11 | 70 |
| YZ | Greene | 177,685 | large | 17.77% | 446 | 4,272 | 1.122 | 1,723 | 11 | 109 |

\* \* \*

We can then compute the metrics:

**Table 2. Sample Secure Communities monitoring metrics**
*Sample data: These are not real counties.*

| County | (1) Foreign-born Arrestee Comparison (quarter) | Foreign-born Crime Comparison, Raw (quarter) | (2) Foreign-born Crime Comparison, Deduplicated (quarter) | (3) Identified Alien Crime Severity Comparison |
|---|---|---|---|---|
| Smith | 0.427 | 0.571 | 0.436 | 1.1 |
| Ng | 0.277 | 0.317 | 0.191 | 1.04 |
| Greene | 0.392 | 0.574 | 0.512 | 1.1 |

- 13 -

Dated:  May 12, 2017                             Respectfully submitted,

/s/ Seth A. Watkins
Seth A. Watkins (D.C. Bar # 467470)
    Email:  watkins@adduci.com
Giang "James" T. Tonthat (D.C. Bar # 1031035)
    Email: ton-that@adduci.com
ADDUCI, MASTRIANI & SCHAUMBERG, LLP
1133 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 467-8647
Facsimile: (202) 466-2006

Of Counsel:
Mark M. Fleming**
    Email:  MFleming@heartlandalliance.org
HEARTLAND ALLIANCE FOR
HUMAN NEEDS & HUMAN RIGHTS
D/B/A NATIONAL IMMIGRANT JUSTICE CENTER
208 S. LaSalle St., Suite 1300
Chicago, IL 60604
Telephone: (312) 660-1628
Facsimile: (312) 660-1505

*moving for admission *pro hac vice*

*Attorneys for Plaintiff*
*Heartland Alliance for Human*
*Needs & Human Rights*
*d/b/a National Immigrant Justice Center*

- 14 -